IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION


UNITED STATES OF AMERICA     \*  Docket No. 2:15-CR-00012
                             \*
                             \*

VERSUS                        \*  February 1, 2016
                             \*
                             \*

ADLEY LEO DYSON, JR.        \*  Lake Charles, Louisiana

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REPORTER'S OFFICIAL TRANSCRIPT OF JURY TRIAL DAY ONE
BEFORE THE HONORABLE PATRICIA MINALDI,
UNITED STATES DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**A P P E A R A N C E S**

FOR THE GOVERNMENT: JOHN LUKE WALKER
                    U.S. Attorney's Office
                    800 Lafayette Street, Suite 2200
                    Lafayette, Louisiana 70501
                    Email:  john.walker2@usdoj.gov
                    Phone:  (337) 262-6618
                    Fax:    (337) 262-6682


                    ROBERT F. MOORE
                    U.S. Attorney's Office
                    800 Lafayette Street, Suite 2200
                    Lafayette, LA  70501
                    Email:  robert.moore@usdoj.gov
                    Phone:  (337) 262-6618
                    Fax:    (337) 262-6682


FOR THE DEFENDANT:  CRISTIE GAUTREAUX GIBBENS
                    Federal Public Defender's Office
                    102 Versailles Boulevard, Suite 816
                    Lafayette, Louisiana  70501
                    Email:   cristie_gibbens@fd.org
                    Phone:   (337) 262-6336
                    Fax:     (337) 262-6605

                         JOSEPH ROUSSEL STREVA, JR.
                         Federal Public Defender's Office
                         102 Versailles Blvd., Suite 816
                         Lafayette, Louisiana  70501
                         Email:  joseph_streva@fd.org
                         Phone:  (337) 262-6336
                         Fax:    (337) 262-6605


REPORTED BY:             DEIDRE D. JURANKA, RPR
                         611 Broad Street, Suite 267
                         Lake Charles, Louisiana 70601
                         Email:  dd_juranka@lawd.uscourts.gov
                         Phone:  (337) 214-6669
                         Fax:    (337) 437-3873

# I N D E X

**PAGE**

**COURT PROCEEDINGS** ..............................   **4**

**OPENING STATEMENTS**..............................   6

**JEFF HALEY**......................................   15

   DIRECT EXAMINATION BY MR. WALKER.............   15

   CROSS-EXAMINATION  BY MS. GIBBENS............   86

```
1                    COURT PROCEEDINGS
2               (Call to order of the court.)
3         THE COURT:  What?
4         MS. GIBBENS:  Your Honor, I had filed a motion in
5    limine and I just request a ruling on the record.
6         THE COURT:  Oh.
7         MR. WALKER:  Your Honor, that is the motion related
8    to striking the funding evidence about the prior money
9    that was paid to the defendant.
10         THE COURT:  The motion in limine is denied.
11         MS. GIBBENS:  Thank you, Your Honor.  I would
12    object to your ruling and ask not to have to re-urge it
13    throughout the trial.
14         THE COURT:  Certainly.
15         MS. GIBBENS:  The other matter would just be if we
16    could sequester witnesses.  I know not all of your
17    witnesses are here, but whoever is.
18         MR. WALKER:  In terms of witnesses in the
19    courtroom, our case agent is exempt from the -- we move
20    that he be exempt from the rule of sequestration.
21         THE COURT:  Of course.
22         MR. WALKER:  Two other witnesses we intend to call
23    today.  They're both in the back.  Three other witnesses
24    I intend to call.  That's true.
25         THE COURT:  Mr. Walker, no one can hear you.
```

1          MR. WALKER:  I'm sorry.  If the Court has no
2     opposition to it, I'm simply going to -- I have a state
3     case agent.  I'm simply going to ask him to go to our
4     office and re-urge they should not speak in any way,
5     shape or form about the case.
6          THE COURT:  Okay with that?
7          MS. GIBBENS:  Yes, Your Honor.
8          THE COURT:  Okay.  Good.  Ready?
9          MR. WALKER:  We are when you are, Your Honor.
10         MS. GIBBENS:  Yes, Your Honor.
11         THE COURT:  Defense.  Okay.  Jury is in the room.
12    Bring them out please.
13                    (Jury enters.)
14         THE COURT:  Ms. Benoit, would you seat them.
15         COURTROOM DEPUTY:  Katrina Langley is going to be
16    in the first seat at the top.  Katrina Langley.
17         THE COURT:  How about we do it the last seat first
18    so people don't have to climb over each other.
19         COURTROOM DEPUTY:  Last seat at the top is Tiffany
20    Thornton and then Eartha Guidry, Jimmy Bloodsworth,
21    Katie Fontenot, Mollie Guidry, Charlotte Benoit, Katrina
22    Singley.  There is Robin Bryant, Christopher Melder,
23    Stephen Lejeune, Keith Castille, Kyle Foreman, Gloria
24    Villegas.
25                    (Jury is seated.)

```
 1            THE COURT:  All right.  Thank you, everyone.  You
 2      may be seated.  Government.
 3            COURTROOM DEPUTY:  I have to swear them.
 4            THE COURT:  Oh, yes.  I'm sorry.  Please stand up
 5      and raise your right hand.
 6                  (Oath is administered.)
 7                      OPENING STATEMENTS
 8            THE COURT:  Mr. Walker.
 9            MR. WALKER:  The year 2005 was a devastating year
10      for the state of Louisiana.
11            THE COURT:  Speak up.
12            MR. WALKER:  As the entire world knows -- the
13      entire United States knew, in August Katrina hit New
14      Orleans, Hurricane Katrina, and the levies broke and
15      hurricane -- and the waters flooded in and flooded New
16      Orleans.  What a lot of people around the country didn't
17      know is that a month later Rita slammed into Cameron
18      Parish and came up the western part of the state and did
19      incredible damage to Louisiana, the western part of
20      Louisiana.
21            Congress, in an effort to do something to help
22      people repair or rebuild their homes, set aside money.
23      Congress told the State of Louisiana, we need you to be
24      the people who actually give the money to people so that
25      they can rebuild their homes or they can repair their
```

1    homes that were damaged as a result of these two

2    hurricanes.  So the State of Louisiana set up the Road

3    Home Program.  The Road Home Program was set up to give

4    money to people so they could rebuild or they could

5    repair homes that had been devastated by Hurricane Rita

6    and Katrina.  In this case we're talking about Hurricane

7    Rita so I'm going to really focus on Hurricane Rita.

8         The State of Louisiana had this money from Congress

9    and so they had to figure out a way they could give out

10   the money to people who were deserving of the money.  So

11   they had to set a plan in action where they can say

12   these are the things you have to have in order to

13   receive money.  So you had to have a home that was in

14   one of the areas that was devastated by Hurricane Rita.

15   You had to actually be not just the owner but you had to

16   be occupying the home that was devastated by Rita.  And

17   it had to actually be your home.  So it couldn't be a

18   home that you were renting from somebody else.  It had

19   to be your home.

20        After they set that up, the next thing they had to

21   set up was they had to set up an application process.

22   And so they created an application so that everybody who

23   wanted to get money through the Road Home Program had an

24   application they had to fill out, and they had to

25   certify the things in their application were true.

1          The problem was this, and it was a huge problem in
2    Louisiana.  And all of y'all who were living in
3    Louisiana when this goes on, y'all know this to be true.
4    Louisiana desperately had to get money into the hands of
5    the people whose homes had been damaged or destroyed as
6    quickly as possible.  Louisiana had been -- I mean,
7    homes in Cameron Parish had been wiped out.  So that was
8    their priority; but at the same time, the other thing
9    they had to do is try to prevent people from taking
10   money who weren't entitled to it.  So you're battling
11   those two different things.
12         They set up an application process, and you would
13   fill out an application.  And those questions that I
14   just talked about, those were in the application.  Did
15   you actually -- was it your primary residence at the
16   time that the hurricane hit?  Did you own it?  Was it in
17   one of the parishes?  And there are other questions, and
18   you're going to see that application.  So those were the
19   things the person had to verify.
20         A problem was this.  They had to get documents so
21   that you could see whether a person actually was the
22   owner and the occupant of the residence at the time that
23   Rita hit.  And so, you know, normally that wouldn't be a
24   big deal.  You'd go down to the courthouse.  You'd get
25   documents that show the act of sale.  You could get all

1  these different documents.  But after Katrina (sic), all
2  those documents had been washed away.  So they'd take
3  anything they could get from somebody.  They would take
4  a utility bill from somebody to show that they had
5  electricity going to the house just before Rita hit.
6  They would take, you know, voter registration documents.
7  They would take whatever they could get to verify that,
8  in fact, you lived in that house.  And if you did the
9  application and you went in and you certified that it
10  was true and you signed and initialed the documents then
11  you could get money from the Road Home Program.
12       And after that, in -- that happened in 2007 and
13  2008.  Then in 2008 they then gave additional money to
14  people who had applied for money in the Road Home
15  Program to elevate their homes so they could raise up
16  their homes, and they could get an additional $30,000
17  for that.  And finally, in 2009, because they had enough
18  money to do this, they gave still additional money to
19  people who had applied for money so that they could
20  either rebuild their house or they could repair their
21  house.  And so you could get this additional money.  All
22  of that money that a person could receive was all tied
23  to the original application; that is, you were a person
24  whose house had been damaged or destroyed in Hurricane
25  Rita and you intended to rebuild it and live in that

1      home.

2            Adley Dyson lied and submitted either false or

3      misleading documents in order to get money that he was

4      not entitled to through the Road Home Program.  Adley

5      Dyson did live in Cameron Parish.  He lived in Cameron

6      Parish on John Street, and in November of 2003 his house

7      burnt down.  And the fire department came out.  The fire

8      was so significant the roof caved in.  The electricity

9      was turned off, and he no longer lived there between

10     November of 2003 and his house burning down and nearly

11     two years later when the hurricane hit.

12           In 2004 Cameron Parish sent him a letter saying

13     "Your house has been condemned.  It's condemnable.

14     Either you need to tear it down or we will tear it down

15     and charge you for it."

16           Those are the things that happened in 2003 and in

17     2004.  And, of course, in 2005 in Cameron Parish

18     Hurricane Rita hit and literally wiped all those houses

19     away.  And then he came nearly two years after his house

20     had burned and he applied for Road Home money.  And in

21     the application process he made statements, and you're

22     going to see those statements, that were obviously not

23     true.

24           The other thing that he did, he submitted

25     documents, at least one document absolutely, that was

1    misleading to the Road Home people.  In that document --

2    and I don't know where the document came from.  It

3    appears to have come from Jeff Davis Electric Co-op, and

4    maybe it did.  What I know is the document that was

5    submitted says that he had electricity in his house from

6    the year 2000 until 2005 just before when Rita hit.  And

7    I can tell you that's not true.  I can tell you it's not

8    true because you're going to hear from somebody from

9    Jeff Davis and what they're going to tell you is that he

10   had electricity from 2000 till 2003 when his house

11   burned down and he never had electricity after that.

12   You're also going to hear that the tax assessor had

13   actually taken his homestead exemption away in 2004

14   because he didn't live there anymore.

15       So he made those false statements and submitted

16   those documents in order to obtain money from the Road

17   Home Program.  He got an initial batch of money.  In

18   2008 he got a letter that said, hey, you can get an

19   additional $30,000 if you said you were going to rebuild

20   your home; and he signed up for it.  He said, "I'll take

21   the 30,000, too."  So he got that.  It was tied to that

22   original application.  And in 2009 he got yet another

23   letter where they were giving out the final batch of

24   Road Home money where he could get additional money.  A

25   person who legitimately whose house had been destroyed

1    in Rita and who was legitimately rebuilding it could get
2    additional money; and he applied for that money, too,
3    and he got it.
4         The facts of the case are going to show that that
5    is exactly what he did.  He defrauded the Road Home
6    Program.  He got money he was not entitled to; and he
7    did it by saying things that were not true and he did it
8    by submitting documents, at least one, that was at a
9    minimum misleading to the people at the Road Home
10   Program.
11        The defendant in this case is charged with wire
12   fraud.  In federal court we have different types of
13   crimes and so I'm going to talk to you just briefly
14   about this so you understand.  Wire fraud is a scheme to
15   defraud.  So I've already talked to you about what the
16   scheme to defraud was, the scheme to get money from the
17   Road Home Program by making statements that were not
18   true and submitting misleading documents.  Then there
19   had to be a wiring in furtherance of it.
20        THE COURT:  Slow down please.
21        MR. WALKER:  Yes, Your Honor.  What I can tell
22   you -- I'm kind of a fast talker.  What I can tell you
23   is the wiring is going to relate from when the money was
24   sent from a bank to his bank.  I can also tell you this.
25   Neither the Prosecution nor the Defense are contesting

1    this.  The fact that a wiring -- the fact that the
2    wiring runs in interstate commerce is going to be
3    stipulated to.  So the thing that you will be listening
4    to primarily in this case will be did he create a
5    scheme.  Did he decide to get money from the Road Home
6    Program that he was not entitled to and to get it by
7    making statements that were not true, that were
8    misleading.  At the end of the evidence in this case, I
9    am satisfied that you will conclude he did exactly that.
10         THE COURT:  Thank you, Mr. Walker.  Ms. Gibbens.
11         MS. GIBBENS:  Thank you, Your Honor.  Ladies and
12   gentlemen, you've already heard a lot about 147 and over
13   the next day or two you're going to hear a lot about the
14   address 147 John Street, Cameron, Louisiana.  This is
15   where Mr. Dyson lived in the 1990's with his family.
16   His parents were there, his siblings.  They lived there.
17   Then in 2000 his parents got divorced.  They split up,
18   and he stayed there.  This was his home so he stayed at
19   147 John Street living, paying bills.  And then in 2003
20   the house caught fire.  It was damaged by fire, but this
21   was his home.  He wanted to rebuild it, to fix it.  He
22   wanted to go back home.  That was where he lived.
23         So that was his plan; but as often is the case,
24   time was in short supply.  He's a commercial fisherman
25   trying to make ends meet and money was in short supply,

1    also.  He didn't have a lot of money.  So before he knew

2    it, it was 2005.  And that's when Rita hit, as we've

3    just heard.  And it was chaos and confusion and

4    devastation in the state of Louisiana, as we all know.

5    Lives lost.  Homes lost.  Heartbreak.  But it was also

6    resilience and rebuilding.  We came back.  People went

7    home.

8         So when Rita hit Mr. Dyson went to the Road Home

9    employees and conferred with them and filled out an

10   application, and in 2009 they sent a letter saying he

11   could get more money.  Because that's what this case is

12   about, the 2009 letter.  And they said you can get more

13   money, and so that happened and that's where the case

14   is.  But what I ask you to remember throughout this

15   case, when you're hearing the witnesses testify and

16   you're going to look at evidence, I want you to listen

17   to the questions the Government asks and the answers he

18   gets but also what cross-examination questions there are

19   and what those answers are because what the Government

20   has to prove is that Mr. Dyson devised a scheme and it

21   was knowing and it was with the specific intent to

22   defraud.  That's a whole lot of proof that the

23   Government has to overcome.  And after you listen to

24   everything and you listen to both sides carefully, you

25   will come back at the end realizing that this case isn't

1     what the Government says.  Mr. Dyson will still be here

2     and you will find in his favor at the conclusion of all

3     evidence.  Thank you.

4          THE COURT:  Thank you.  Call your first witness.

5          MR. WALKER:  Your Honor, it's just going to take

6     one second for me to get my laptop and get it turned

7     back on.  The first witness is Jeff Haley.  I believe

8     he's in the witness room.

9          THE COURT:  Can someone go fetch him?

10         MR. WALKER:  They did just now.  Your Honor, while

11    the witness is coming in, the United States would at

12    this time move to introduce United States Exhibit 1

13    through 21.  I've spoken to the Defense previously and

14    there's no objection to its introduction at this time.

15         THE COURT:  Is that true?

16         MS. GIBBENS:  That's correct, Your Honor.

17         THE COURT:  Accepted.  Not that I doubted you,

18    Mr. Walker.

19                        **JEFF HALEY,**

20    after being first duly cautioned and sworn to tell the truth,

21    the whole truth and nothing but the truth, did testify on

22    oath as follows:

23                    **DIRECT EXAMINATION**

24    BY MR. WALKER:

25         **Q.**   Could you tell me your name.

1          **A.**   Jeff Haley.

2               THE COURT:  You're going to have to speak up.

3          **A.**   Jeff Haley.  Is that good?

4               MR. WALKER:  I think she was talking to me, not

5     you.

6               THE COURT:  No, I was talking to him.

7     BY MR. WALKER:

8          **Q.**   Where are you employed?

9          **A.**   I'm employed with the Office of Community

10    Development, Disaster Recovery Unit, for the State of

11    Louisiana.

12         **Q.**   How long have you been there?

13         **A.**   Since May of 2009.

14         **Q.**   In that, are you connected to the Road Home

15    Program?

16         **A.**   I am.  I'm the director of the Homeowner Program

17    which is the Road Home.

18         **Q.**   Prior to working at the Road Home Program where did

19    you work?

20         **A.**   I worked with ICFI which was the contractor that

21    executed the Road Home Program.  I started there in 2006 when

22    the program started.

23              THE COURT:  What does that mean, ICFI?

24              THE WITNESS:  It's Inner Childhood Foundation.  It

25         goes way back to 1972.  The company has changed.  They

1          just never changed the name.

2                   THE COURT:  Okay.  But --

3                   THE WITNESS:  It's always referred to as ICFI.

4                   THE COURT:  I didn't hear what the last I meant.

5                   THE WITNESS:  Oh.  International.

6     BY MR. WALKER:

7          Q.    And when you were working at ICFI, what were they

8     doing in connection with the things that the Road Home

9     Program does?

10         A.    They were the contractor that, actually, the State

11    contracted to execute and implement the Road Home Program.

12    So to see all of the 2,229 plus applicants and process them

13    for the Road Home closing grants.

14         Q.    Are you the custodian of records --

15                  THE COURT:  I'm sorry.  I really don't understand

16         what that means, and if I don't understand it --

17                  MR. WALKER:  Judge, I'll ask some questions to

18         explain.

19                  THE COURT:  Please.

20    BY MR. WALKER:

21         Q.    In 2005 did Hurricane Katrina and Rita hit

22    Louisiana?

23         A.    Yes.

24         Q.    And as a result of that, did Congress give money or

25    set aside money to help people who had their property damaged

1    or destroyed as a result of it?

2        A.    Yes, that's exactly what Congress did.

3        Q.    Was ICFI, the company that you first worked for,

4    were they a company that was in part responsible for

5    determining who should be able to get that money?

6        A.    Yes.  They were entrusted to execute the program

7    and so that was their role, is to process the applications

8    and determine eligibility for the grant.

9        Q.    Was that your role in connection with your job at

10   ICFI, was to set up that program?

11       A.    Yes.  I had several roles when I was there, but

12   implementing the program, serve as a center manager when the

13   program first started, which was -- actually, the first six

14   months was just trying to be able to have intake of seeing

15   applicants.  Every applicant had to come in for an

16   appointment, sit down and go over the program and look at

17   their eligibility and collect documents.  And so I oversaw

18   that and moved into a program management role which worked

19   with policy and other things at the end of the contract.

20       Q.    As a result of your role at the Louisiana Road Home

21   Program, are you the custodian of records for the Louisiana

22   Road Home Program?

23       A.    Yes, I am.

24       Q.    And as the custodian of the records, is there a

25   file within your organization for all the people who received

1    money through the Road Home Program?

2        A.   Yes.  There's actually a file for every single

3    person that applied.  We have a system called eGrants.  It's

4    a software system that was designed specifically for the

5    program to input and intake all of the data elements or the

6    information that was needed to process the application.

7        Q.   Now, I need to step back.  So we're going to talk

8    about -- you testified that Congress actually earmarked money

9    and said this is money to try to either repair or rebuild

10   homes that have been devastated by Katrina or Rita.

11       A.   Correct.

12       Q.   Was there a federal agency that was going to be

13   responsible for getting that money out?

14       A.   Yes.  The federal agency is what we refer to as

15   HUD, but it stands for Housing Urban Development.

16       Q.   Was part of the money that was set aside set aside

17   for people who intended to rebuild their homes?

18       A.   Yes.  The Road Home Program had three different

19   options that people could select.  Primarily, over 119,000

20   chose that first option which was to rebuild and reoccupy

21   their damaged dwelling.

22       Q.   Now, when the State of Louisiana got this money was

23   one of the things Congress required is that you set up a

24   system of determining who should be eligible for the money

25   and who should not?

1      A.    Actually, HUD does, the Department of Housing Urban

2   Development.  Congress appropriates the money, provides the

3   money for the disaster to HUD, and then HUD awards those

4   grant funds.  The State has to put in an application, we call

5   it an action plan, that has to be approved before HUD will

6   award those funds.

7      Q.    Did Louisiana set up prerequisites that an

8   applicant had to have in order to be entitled to get money

9   through the Road Home Program?

10      A.    Yes.  Part of that action plan involved several

11   different programs.  The Road Home was the largest and it

12   would have specific eligibility requirements that would show

13   and demonstrate that a homeowner had received damage from

14   either Hurricanes Katrina or Rita and was in need of

15   assistance for recovery.

16      Q.    So let's talk about the individual things.  Can you

17   tell me the different elements of the action plan that a

18   person had to meet in order to be entitled to the money?

19      A.    Sure.  They had to live, first of all, in one of

20   the 37 parishes that were declared by the President as

21   disaster recovery needs.  Secondly, they had to -- they had

22   to apply with FEMA.  Thirdly, they had to be an owner

23   occupant of the damaged dwelling.  Fourthly, they had to

24   receive -- they had to have had damage as related to either

25   Hurricane Katrina or Rita.

1    Q.   Go ahead.

2    A.   The last thing was we also had a requirement they

3 had to have the proper we call it the structure type.  It had

4 to be a single family dwelling or a duplex.  New Orleans had

5 a lot of duplexes.  Once you moved beyond that, like a

6 triplex or a larger building, they entered into -- we had a

7 rental program.

8    Q.   Was there an application that y'all created for

9 each of the people who had to -- that people had to fill out

10 in order to begin the process of getting those funds?

11   A.   Yes.  There was an application that was designed

12 and created with the flexibility to allow the homeowners to

13 actually go on-line to fill it out.  They could request a

14 paper application if they didn't have access to the internet.

15 They could mail that in or -- and very few did that.  Most of

16 them came in for -- everyone had to come in for their initial

17 appointment, and at that time all of the information could be

18 taken down.

19   Q.   In terms of the application, you talked about those

20 five things a person had to show.  Generally, did the

21 application have questions related to those five things a

22 person had to show?

23   A.   Yes, all five of them.  There were different

24 questions that were asked to make sure they fit in those

25 eligibility requirements.

1      **Q.**   So did the application ask if the person was the

2    owner of the property?

3      **A.**   Yes, it did.

4      **Q.**   Did it ask if the person was the occupant of the

5    property?

6      **A.**   It did.

7      **Q.**   Did it ask if their property had been damaged as a

8    result of either Hurricane Katrina or Rita?

9      **A.**   Yes, it did.

10      **Q.**   And finally, did it list out the location of the

11    property?

12      **A.**   Yes.  They had to put their damaged address.

13      **Q.**   In doing that, did that give you the ability to

14    check and make sure that, in fact, their property was within

15    one of those parishes that was entitled to money?

16      **A.**   Correct.  That's what we used those questions for,

17    to do that verification.

18      **Q.**   Now, you talked about the fact that a person could

19    go on-line and fill out an application or they could fill out

20    a paper application or even fill out an application inside of

21    one of the Road Home centers.  Was there a requirement that

22    no matter how you actually met -- no matter how you actually

23    initially filled out the application, that you had to talk to

24    somebody about it?

25      **A.**   Yes.  The mailing of the application and the

1    on-line, it was always envisioned that everybody would have
2    an appointment to confirm the information.  The mailing of
3    the application, the on-line process, was really just trying
4    to help the State understand the gravity of how many people
5    had been affected by the storm and for purposes of budgeting
6    and what amount of money was going to be needed.  But it was
7    always envisioned and was followed through when the program
8    was initiated that August of 2006 that we started scheduling
9    appointments.  Regardless of whether you had mailed in an
10   application or gone on-line, you had to come in, sit down --
11   it's about a two-hour process where people would walk through
12   the application and answer the questions with their case
13   adviser.
14       Q.   Okay.  So you talked about a case adviser.  Is the
15   case adviser the person who actually talked to them in that
16   meeting?
17       A.   Yes.
18       Q.   And did the case adviser during the meeting verify
19   the answers to the questions that we just talked about, were
20   you the owner of the property, were you occupying the
21   property?  Was it all of those different questions?
22       A.   Yeah.  They would walk through -- they had -- all
23   of them were trained.  They had talking points to help the
24   homeowner understand.  In fact, when the homeowner first came
25   into the center, we called them housing centers, there were

1    lobbies.  Obviously, there were lots of people.  But there
2    was a -- we normally had a PowerPoint presentation going that
3    talked about the program, what it meant to be in the program,
4    to be eligible.  And then you would go sit down, when your
5    appointment was scheduled, with the case adviser and they
6    would begin to walk through the application process with the
7    person.  After that was completed, that application would be
8    then printed so that the case adviser and the homeowner could
9    review it to verify everything was entered correctly into the
10   system.
11       Q.  Was there -- okay.  So a person says, "Okay.  It's
12   my house.  I own it and I was living in it just prior to
13   Rita."  Did they simply take their word for it or did the
14   Louisiana Road Home Program require some kind of
15   documentation?
16       A.  The intent was for the homeowner to provide the
17   information and then the State -- we had -- again, this was
18   happening very fast; but the State had different mechanisms
19   that they would use, different ways to verify that
20   information.  If we were unable to successfully then, yes,
21   the homeowner would often have to provide further
22   documentation to verify, like, the ownership or the
23   occupancy.
24       For example, one of the ways that we were trying to do
25   this was to, obviously, get the money out to homeowners that

1    were in need as fast as possible.  We used the tax assessor

2    records to verify whether somebody may have had a homestead

3    exemption on their property.  And if they did then we would

4    count that as occupant, verified for occupancy.  However, if

5    we didn't have that, before that person could move forward we

6    would have to collect documents from them.

7        Q.    So you might collect what types of documents?

8    Well, to start off with, when you first planned it did you

9    plan it so it was going to be really structured and you'd be

10   able to get exact documents so there wouldn't be any doubt

11   that this person was the owner and the occupant at the time

12   of Rita?

13       A.    Yes.  Obviously, when you're -- remember, this is

14   the largest disaster that our nation's ever seen and the

15   first program like this.  So the design was -- we realized

16   homeowners had lost a lot of documents, and was to try to not

17   put that burden on them but to be able to verify as much as

18   we could.  And so for each of those things we pulled title on

19   the property.  So that's how we looked to see whether or not

20   somebody owned the property or not.  Like I said, we would

21   use the tax assessor records to see if there was a 2005

22   homestead exemption on the property and that would verify the

23   occupancy.

24       Q.    As time went on did you begin to accept -- I mean,

25   when people were unable to get those documents would you

1    accept things like a utility bill to show, in fact, they were

2    the owner occupant?

3       A.   Yes, because there were -- you know, not only were

4    homeowners devastated but a lot of parish governments were as

5    well.  So getting that information was difficult.  So there

6    were different documents.  The policies were broadened and a

7    letter from your utility company or a utility bill in the

8    month that the storm happened, so August for Katrina,

9    September for Rita, would have been acceptable to prove

10   occupancy.

11      Q.   You previously testified about the fact that the

12   case manager would personally review the document with the

13   person who was applying for the money.  As they would review

14   the document, was there anything that they would do or

15   require that the applicant do to verify that he had reviewed

16   the document with the case manager?

17      A.   Yes.  Once the application was completed, before it

18   was submitted, we would print that application out.  It's

19   several pages, been anywhere eight, 10 pages.  They would

20   print it out and have the applicant, the homeowner, would

21   initial each page.  And then on the very last page they would

22   have the homeowner sign it and date it.

23      Q.   That case manager filling out this document and

24   reviewing it, did they have any kind of training that they

25   had to go through as to what they were supposed to do in

1    connection with these interviews?

2        A.    Yes.  That was part of the contract that the State

3    had with ICF.  They realized the mass, the enormity of the

4    program.  So all employees were required to go through -- the

5    initial training was a five day training, 8:00 to 5:00 type

6    deal, that walked them through the policies, the software,

7    talking points, case management, involved several things.

8    And then throughout the program there were ongoing trainings

9    that would take place.

10       I had said earlier that I was a center manager.  One of

11   the things that we had to do, every night we had a call with

12   a program director, the 10 different center managers, to

13   communicate anything that may have changed or talking points.

14   And then we had to make sure that all of our employees knew

15   those things the next day before even seeing applicants.  So

16   it was an ongoing thing that, yes, training was taking place.

17       Q.    So, for example, though you wanted really

18   structured documents to verify everything, as you realized

19   you need it, you were only going to be able to get fewer and

20   fewer documents.  Like, a utility bill might be what you were

21   able to actually obtain.  Were you having to let the case

22   managers know that, look, we'll accept these things to

23   demonstrate occupancy?

24       A.    Yes.  The policies would be updated.  In fact, that

25   was another thing that the contractor was required to do

1    every month.  I mean, that's how things were transitioning.

2    They were required to present to the State an updated policy

3    manual so that it would stay current, that people -- it

4    wasn't just training for employees but just even for the

5    media, for homeowners.  You know, there were several

6    different outreach events and communications that took place

7    so that we could educate as many people as possible regarding

8    the program.

9         Q.   What was your priority as the Road Home Program?

10        A.   Obviously, the priority then and today was to help

11   as many people in the state of Louisiana get home that had

12   been devastated by these two hurricanes that hit and were in

13   need of recovery as fast as possible to keep the

14   infrastructure and just the economy of our state going.  It

15   was critical.  I think our governor realized that all of

16   these things were going to fall apart, in fact he said that,

17   if we didn't get homeowners home.  And so that was our

18   priority.

19        Q.   As a result of that, is that the reason you were

20   accepting, essentially, fewer and fewer documents in order to

21   verify information?

22        A.   Yes.  You know, as people -- we would have

23   panels -- as folks were having difficulty providing documents

24   or obtaining them, we would broaden that and allow people to

25   supply other things that would show that, yes, they were

1    living there, yes, they owned the property.

2        Q.    Now, I want to go back to the case managers for a

3    minute.  Those are the people who were actually, essentially,

4    there on the ground interviewing the applicants, obtaining

5    the information from them.  Were there specific questions in

6    the application they could answer yes or no or add

7    information to?

8        A.    Yes.  The question -- lots of questions are in the

9    application, obviously, from providing insurance policy

10   numbers, your FEMA registration number.  There were yes and

11   no questions regarding every one of the eligibility

12   requirements that we talked about.  They would provide

13   information regarding their household members.  So if there

14   were four people living in the household, they gathered birth

15   dates and dates.  So there was a lot that was put into the

16   application.

17       Q.    Was there a part of the application that was like a

18   large area where the case manager could type anything else

19   that the applicant might have told him or her that was

20   relevant?

21       A.    Right.  At the very end of the application process

22   there's a comments section, and so it was more of a free text

23   where they could type in had the homeowner shared anything

24   with them that would be relevant for when their case was

25   being looked at for closing and for validation purposes.  For

1    example, there were homeowners that may have came in and one

2    of the things the program experienced, the challenge was,

3    especially in New Orleans, a lot of title transfers had never

4    taken place.  People were living in their grandparents' home.

5    So when we would go to pull title it wasn't going to show

6    they owned it even though they may have had an ownership

7    interest.  So they would share those things or say --

8         You know, a lot of people forget the storms happened in

9    '05; the program doesn't start till '06, and so a year's gone

10   by.  And some people would come in and apply for their

11   parents' home and their parents had, unfortunately, passed

12   away in that year.  And they still wanted to repair the home.

13   It was still the intent of the program, we didn't want to

14   have blighted structures out there.  So whatever we could try

15   to do to help that recovery was critical for those case

16   advisers to take the notes down and put it in that comments

17   section.

18        Q.   Were they trained on that?  Were all the case

19   managers trained on what this area of the application was

20   for?

21        A.   Yes.  They had a whole -- we had different modules

22   for training.  There was a whole module on eGrants, is what I

23   said was the name of the software, on how to input the

24   information, where to input the information and such.

25             THE COURT:  What's a module?

1          THE WITNESS:  A module is a training session.  So

2      that week long training that I talked about, it was

3      broke up into 12 different sections.  So we would call

4      each one of them a module.

5  BY MR. WALKER:

6      Q.   Kind of like a little PowerPoint presentation where

7  you teach somebody about something?  You'd have a PowerPoint

8  go --

9      A.   Correct.  Like, Module One was the overview of the

10 Road Home Program.  So that's the first thing everybody

11 learns, is what is the program, how is one eligible for the

12 program.  Module Two may deal with the insurance part.

13 Module Three dealt with the appraisals.  We had to do

14 appraisals on the property.  We did damage assessment.  So

15 each element or each factor into a person's eligibility and

16 their grant had a separate section or module for training.

17     Q.   And did you actually participate in the training or

18 were you overviewing the training of those people who were

19 case managers?

20     A.   I actually did both.  Obviously, I went through the

21 training myself; but as time progressed, the company had a

22 training department.  It was that important to have people on

23 the ground for the whole three years of that contract that

24 were doing the same thing, updating the training, making sure

25 that employees would do these on-the-job trainings that we

1   called them.  But from an operational standpoint, as a center

2   manager managing employees, I would participate in the

3   training to help get greater clarity for employees.

4       Q.    So as we talk about that section of the application

5   where the case manager can essentially type in any of the

6   stuff the person talks about, was one of the things people

7   were trained about was that if somebody were to say that "I

8   didn't own this home," that would be information that they

9   would place in that area?

10      A.    Correct.  It's important to remember that we called

11  them the case advisers.  Their role was just to intake the

12  data and input it in the system.  We trained them.  Their job

13  wasn't to make the decision when that person came in for

14  their appointment whether or not they were eligible or not.

15  That was later done.  We had what's called a preclosing

16  before the person would go to closing.  We had case managers

17  that would review the file.  The role of the case adviser at

18  the time of the appointment was to gather the information,

19  everything that the homeowner said, answer questions.  But

20  because we had over 200,000 people applying, because policies

21  were changing, we didn't want to turn anybody away.  We

22  realized, again, the devastation and wanted to be able to

23  make sure that if a policy changed somebody didn't get turned

24  away that could be eligible.  And so they were instructed to

25  go through the application process with everyone.

1    **Q.**   Were they also supposed to put in that area

2    everything that might be relevant to whether they were

3    entitled to money from the Road Home Program?

4    **A.**   Yes.

5    **Q.**   So, for instance, if somebody said, "The house

6    wasn't mine," would that be something they were trained to

7    place there?

8    **A.**   Yes, they would have put that in the comments.

9    **Q.**   If they said something related to the condition of

10   the home prior to Rita hitting, like it had been damaged in

11   some way, would that be something they were trained to put

12   into that comments section?

13   **A.**   Yes.  That's what the comment field was for, was

14   to -- so that when it could be -- it would be reviewed, those

15   comments, and it's in the records, you know, what the

16   homeowner actually said, what was recorded so when they were

17   looking at their file for eligibility decisions could be made

18   whether or not that was relevant or not.

19   **Q.**   Were there -- okay.  So now we've covered the

20   application.  Were their inspection people who would actually

21   go out and inspect the places that were damaged or destroyed?

22   **A.**   Yes.  So part of the application process was to

23   inform the homeowner that somebody would be coming out to the

24   property to do what we call an estimated cost damage.  We

25   actually sent out an inspector, went out to each property.

1    There were two types of damages assessments that were

2    completed.  The first one we called -- it's an estimated cost

3    to rebuild, called it a type one.  Lots of people know that

4    phrase.  But the estimated cost to rebuild was just that,

5    what would it take to rebuild this property if it was

6    completely destroyed, which some homes were.  The second

7    estimate -- and so every home had a type one or estimated

8    cost to rebuild.  It was basically the footprint, square

9    footage of the home, so that we could calculate that.  The

10   second type was called the estimated cost to repair and that

11   was more of an in-depth going room by room assessing the

12   damage, looking at damages in the rooms, taking measurements

13   of each room and noting where there was damage, taking

14   pictures, and using those to damage -- a percent of damage

15   would then be calculated.

16       Q.   In Cameron Parish, are you aware that most of the

17   houses were just gone?

18       A.   Yes.  There were lots that just weren't there.  Any

19   time that the home wasn't there or -- and there also were

20   instances where the home was just too unsafe to enter and do

21   a damage assessment.  The estimated cost to rebuild would be

22   the only damage assessment completed on the home.

23            THE COURT:  Say that again.

24            THE WITNESS:  Any time that there -- the home was

25       gone, so there's nothing there, or when the inspector

1   went to the property, they were trained if they felt
2   like it was not safe to enter the home they would not
3   enter the home and do that damage estimated cost to
4   repair.  They wouldn't go room by room.  They would just
5   take a footprint or a measurement of the floor plan and
6   do the estimated type to rebuild the home.
7        THE COURT:  Okay.
8   BY MR. WALKER:
9        Q.   So what do you do if you go out to a place in
10  Cameron Parish that doesn't have a slab and the house is just
11  gone?  How do you determine how big the house was?  I mean,
12  you can't really -- if the house is just gone, it would be
13  difficult to measure out the size of it.
14       A.   In the application process, after the application
15  is done, the inspection form that's completed, the
16  homeowner's there for that as well.  They get the square
17  footage of the home and so that's what they would have used.
18       Q.   And is that what y'all use, then?  Basically, y'all
19  just trust them under those circumstances?
20       A.   Yes.  When we're not able to --
21       THE COURT:  Talking about the homeowner, trusting
22  the homeowner?
23  BY MR. WALKER:
24       Q.   Trusting the homeowner that he gave you the right
25  square footage.

1          A.    Correct.  When there is not data to verify, the

2     homeowners were able to self-certify.

3          Q.    When you say self-certify, that's kind of a five

4     dollar word.  That means the homeowner tells you how big the

5     house is and you say --

6               THE COURT:  Slow down.  Slow down.  Slow down.

7          A.    Yes.

8     BY MR. WALKER:

9          Q.    Was there a specific amount of money that you paid

10    per square foot in -- not paid, but was there a specific

11    amount of money per square foot that you used in calculating

12    the value of the home?

13         A.    We used the -- for the estimated cost to repair,

14    which is the square footage amount, $130 a square foot was

15    used to calculate the damage, not the value of the home.

16    That was an estimate of using $130 of what the State

17    estimated it would cost to actually have to rebuild that

18    structure.  So if you have a thousand square foot home then

19    it would basically calculate -- your estimated cost to

20    rebuild the home would have been $130,000, 130 times a

21    thousand square feet.

22         Q.    And if the house was just gone, would you still use

23    that $130 a square foot?

24         A.    Yes.

25         Q.    So if a person had a thousand square -- if they

1    self-certified that they had, let's say, a 2,000-square foot

2    home then you'd multiply 2,000 times 130, which would be

3    $260,000.

4        A.   Correct.

5        Q.   Was there certain money that had to be subtracted

6    out of that 200 -- we're going to use my hypothetical of a

7    2,000-square foot home.  Would there be certain money that

8    had to be subtracted out of that $260,000?

9        A.   Yes.  For all grants, we started at their damages.

10   We also did an appraisal on the property.  And the policy

11   required us to use the lesser of the two, so the smaller

12   amount.  If the damage in your hypothetical here of

13   2,000 square feet, $260,000, if that's the lowest amount, we

14   start there; but before you calculate the grant you have to

15   subtract or remove any other sources of funding that a

16   homeowner may have received for damages as related to

17   Hurricane Katrina or Rita.

18       Q.   So if you got insurance -- let's say it's $260,000.

19   If you got $50,000 in insurance, would you subtract that out?

20       A.   Yes.  That's could a duplication of benefits.

21       Q.   And if you got $50,000 from insurance and then you

22   got another $50,000 from FEMA associated with it, would you

23   subtract out $100,000?

24       A.   Right.

25       Q.   So then you'd be left with $160,000 after you

1    subtracted out that money?

2        A.    Correct.

3        Q.    And that would be the value of the property for

4    determining how much money the person might get?

5        A.    That would be the dollar amount that we would use

6    to determine the grant, yes.

7        Q.    And was there a cap on how much money y'all could

8    actually give the homeowner?

9        A.    Yes.  The policy capped the program at $150,000.

10       Q.    So that would be the maximum the person could get

11   no matter how you did this calculation?

12       A.    Right.  An example you just gave is, I think, 160

13   is what was left.  The homeowner would have only be able to

14   get 150,000.

15               THE COURT:  Is the maximum that they could get.

16               MR. WALKER:  From the Road Home Program.

17               THE COURT:  Right.

18   BY MR. WALKER:

19       Q.    So from the Road Home Program there was a maximum

20   that the State of Louisiana set up that you could receive

21   from the Road Home Program, $150,000?

22       A.    Correct.

23       Q.    So going back to the hypothetical, 2,000-square

24   foot house, $260,000 when you multiply 130 times that.  If

25   they got 50,000 in insurance and 50,000 in FEMA then they'd

1   have $160,000 left.  Of that, the most they could get would

2   be $150,000 from the Road Home Program?

3       A.   From the Road Home Program, yes.

4           MR. WALKER:  Sometimes you'd like to look at the

5       jury and say, "That made sense to me.  I hope it made

6       sense to everybody else"; but we can't.

7           THE COURT:  I'm trying.  You know what --

8           THE WITNESS:  The white board is often good.

9           THE COURT:  -- let's take a 10 minute recess.  And

10      based on the fact this is a numbers trial, I'm going to

11      give the jury notebooks so they can take notes.

12          MR. WALKER:  Thank you, Your Honor.

13          THE COURT:  10 minutes.

14                  (Recess is taken.)

15          THE COURT:  Everybody ready?

16          MR. WALKER:  We are, Your Honor.

17          THE COURT:  Go ahead, Mr. Walker.  Oh.

18          MR. WALKER:  He's coming.

19          THE COURT:  Can't go ahead with nobody there.

20          MR. WALKER:  Of course, it goes without saying that

21      you're sill under oath.

22          THE COURT:  Yes.

23          THE WITNESS:  Yes.

24   BY MR. WALKER:

25      Q.   We talked about earlier the change to the

1    documents.  That is, when originally the Road Home Program

2    was started y'all were trying to get a mass of documents to

3    absolutely verify that somebody lived at this residence at

4    the time of the hurricane and owned the residence at the time

5    of the hurricane.  And then over time the documents you were

6    accepting, rather than accepting, like, the document from the

7    courthouse, you might accept a utility bill or voter

8    registration, something like that.

9         A.    That is correct.

10        Q.    Do you remember that testimony?

11        A.    Yes.

12        Q.    So the documents might have changed.  Did the

13   actual requirements ever change in terms of what a person had

14   to do to be eligible?

15        A.    No.  That's still the exact same requirements

16   today.

17        Q.    So we've talked about the application process and

18   we've talked about the fact that an inspector goes out.  When

19   the inspector goes out to the location, in Cameron Parish, as

20   you've testified, there were lots of places where there was

21   nobody there.  How would the inspector determine where the

22   location was that he was supposed to be photographing?

23             THE COURT:  You lost me on that one.

24             MR. WALKER:  I will go back, do it again.

25   BY MR. WALKER:

1    Q.   Let's say you're supposed to go to 147 John Street

2   in Cameron, Louisiana; and so you go out and you find the

3   sign that says John Street.  How do you know where 147 is if

4   there's just nothing on that street anymore?

5    A.   The program, early on, worked with an I.T. company

6   to do what they call geocoding.  I can't explain all that to

7   you; but that's where they take a GPS reading, longitude,

8   latitude, of property addresses.  Those are all recorded in

9   the property description.  So they had a device that they

10   brought with them that they would have to take pictures of

11   the longitude and latitude, that geocoding, so that they

12   could pinpoint or try to as best possible pinpoint where the

13   damaged structure sat before the storm.

14    Q.   So in Cameron, Louisiana, if it's not sitting on a

15   slab, basically, they're just going to be taking a piece of

16   bare earth that happens to be where they think the house

17   might have been before?

18    A.   Correct.

19    Q.   In terms of any way for them to actually determine

20   the size of the house, it's going to be impossible looking at

21   that piece of bare earth?

22    A.   They're going to have to rely on what the homeowner

23   tells them.

24    Q.   Did the people who were the inspectors, were they

25   trained on what they had to do?

1     A.    Yes, they were as well.

2     Q.    And was there a training process not the same but

3  similar to the type of training that the case managers used?

4     A.    Yes.  They would have gone through the overview

5  training that we talked about and then they would have had

6  specific modules or sections specifically for them.

7     Q.    And the sections specific to them would be this is

8  how you're supposed to go out and look at the property, and I

9  guess it's much more complicated.  If you're in Cameron

10 Parish and there's nothing there, it's pretty simple, right.

11 Just take a picture of the bare earth.  On the other hand, if

12 go to Lake Charles and there's a house that had a tree fall

13 through the middle of it then they'd be talking about

14 repairing versus replacing; is that right?

15    A.    Right.  It would obviously take more time.

16    Q.    And so they have more training on that, what they

17 need to do in connection with repairing, than they do if a

18 person just has to rebuild?

19    A.    Right.

20    Q.    Were they instructed to take photographs of those

21 places?

22    A.    Yes.  All the home inspections have photographs of

23 the house.  If the house wasn't there, it's just the slab or

24 the earth.  If the house is there, they would take a picture

25 of the house.  They'd take a picture of the mailbox.  When

1    the house is there we wanted the homeowner present so they

2    would always take a picture of the homeowner.  That was

3    another way to verify that you're at the right place, with

4    the homeowner in front of the house.

5        **Q.**   Were they actually taught that one of the things

6    you have to do, if there's a homeowner who is at the scene --

7            THE COURT:  Let's speak about who they is because

8        it's getting a little confusing.

9    BY MR. WALKER:

10       **Q.**   If the inspector shows up at the scene and there's

11   no house there but there is a homeowner, the person who says

12   "This used to be my home," were they instructed to photograph

13   that person, too?

14       **A.**   Yes.

15       **Q.**   So, as the custodian of records, when you look at

16   records of homes where inspectors have seen the owner of the

17   home at the location, what have you found?

18       **A.**   Most of the time the home is still there.  The

19   homeowner would show up and walk and be with the inspector.

20   When it's just a blank slab or just the lot sometimes the

21   homeowners weren't there, and they weren't required to be

22   there.

23       **Q.**   If the homeowner was there, would you find a

24   photograph --

25       **A.**   Yes.

1      **Q.**   -- of the homeowner inside the file?

2      **A.**   Yes.

3      **Q.**   And if the homeowner was not there, would there be

4    the lack of that photograph of the homeowner?

5      **A.**   Yes.

6          THE COURT:  Okay.  Say that again.

7    BY MR. WALKER:

8      **Q.**   If the homeowner was there at the scene where his

9    house used to be, would the inspector photograph the

10   homeowner?

11     **A.**   Yes.  Just normal policy or protocol would be to

12   take a picture with the homeowner at the damaged address.  If

13   the homeowner's not there then they're just going to take a

14   picture of the damaged address.

15         MR. WALKER:  And I very much appreciate it, Your

16         Honor, because sometimes when I say things it makes

17         perfect sense to me and everybody else is looking at me.

18         THE COURT:  I know.  I understand.

19   BY MR. WALKER:

20     **Q.**   Who was it that determined eligibility?  Who

21   determined, oh -- you've got all this stuff.  You have an

22   application.  You've had documents presented.  You've had an

23   inspection.  Who was it, ultimately, who decided if a person

24   was eligible to get Road Home money?

25     **A.**   The program, ICF, the company that was running the

1    program, they were responsible for determining eligibility.

2        **Q.**    Like you?

3        **A.**    Yes.

4        **Q.**    I mean, you were a guy working for them so you were

5    one of the people who was responsible for determining

6    eligibility?

7        **A.**    I didn't look at the files.  Yes.  I was doing

8    other things.  But we had preclosing case managers that

9    looked at each of the files.  They had a quality assurance.

10   Many people looked at a file.  I should say that.  I would

11   probably say more than five people looked at a file at any

12   given time that somebody closed because there were checks and

13   balances to make sure that this file was ready to go to

14   closing.

15       In fact, let me be very clear there.  So the program, I

16   said ICF, was responsible for determining eligibility and

17   they were.  They did the preclosing evaluation.  They would

18   look at the file.  But every file that went to closing

19   also -- then they went through a quality check that ICF had

20   in place, but then there's a third level that it would go to

21   the State.  In the early days there's 10,000 files coming at

22   a time.  The State's role was to do a sample of the files

23   before files could go to closing.

24       **Q.**    Basically, you didn't have time.  It wasn't

25   possible to look at all of these files.  You had to pull them

1    out and look at individual files and see if they fit?

2        A.    State did a five percent review.

3        Q.    Was that because they were so desperately trying to

4    get the money out as quickly as possible?

5        A.    Yes, and just the resources and the enormity and

6    the scope of how many files were coming.  ICF had almost a

7    thousand files a day that was coming to the State.  So that's

8    where the five percent review came in place.

9        Q.    So now the person's done this application.  Y'all

10   approved it.  They've gone through and they've gone a closing

11   on it, and they say this person's entitled to $80,000.  I'll

12   just pick that number.  How do you get the money to give it

13   to them?

14       A.    Once the file moves to what we call closing, it

15   went to a title company.  Those funds are requested from

16   Housing Urban Development, from HUD.  The money is actually

17   in D.C.  It's in a system we call e-Locks, which is

18   electronic --

19       Q.    I tell you what, what we're going to do --

20       A.    It's a bank account.  How's that for a simple --

21             THE COURT:  E-Locks we know that's --

22             MR. WALKER:  Makes me think of a movie.

23             THE COURT:  -- time machine.

24   BY MR. WALKER:

25       Q.    So may I ask it in a simpler way.  Y'all say it's

1        okay to give them the money.

2            A.    Right.

3            Q.    Okay.  You just testified to the fact that HUD are

4        the people responsible.  The federal government has,

5        essentially, a big checking account where they put money to

6        pay people through the Road Home Program.

7            A.    That is correct.

8            Q.    Does HUD --

9                  MR. WALKER:  I'm going to ask this in a leading

10           way.  It's just because I think it's not in question.

11                 THE COURT:  You've been doing that all afternoon.

12                 MR. WALKER:  I'm trying to keep the pace moving.

13                 THE COURT:  I understand.

14       BY MR. WALKER:

15           Q.    Does HUD then have them wire that money down to an

16       account?

17           A.    Yes.

18           Q.    And where does it go to?

19           A.    It goes to the chief financial office for HUD which

20       is in the Fort Worth, Dallas, Texas area.  And then they wire

21       the money to Louisiana, the State Treasury.  And then at that

22       point now the Road Home Program, the State, has control of

23       the funds.  We send the funds to the title company, and the

24       title company would either disperse those funds to the

25       homeowner through a check or through an electronic funds

1    transfer.

2        Q.    Okay.  So now here's where we are.  Here's where we

3    are.  They have done the application.  They have sent the

4    money to the guy by wire transfer.  Does the Road Home

5    Program, even after they've given the money to the people,

6    have a process of reverifying if everything on the

7    application is true and correct?

8        A.    Yes.

9        Q.    Why would they do that after they've given the

10   money out?

11       A.    Because the program was moving so fast and there

12   were thousands of people that we were trying to get the funds

13   to to help recover and so those quality controls were put

14   into place after the fact.  In fact, there were documents the

15   homeowners signed in the closing documents that basically

16   stated that, that the program reserved the right to be able

17   to go and to reverify, to recheck these things.  It's also a

18   requirement that HUD puts on the State of Louisiana that we

19   are to continue through a period of time to do those

20   duplication checks.  For example, just, you know, a lot of

21   people didn't get their insurance money right away.  So they

22   get a grant, but it's required if insurance funds come in

23   even after they got their grant that then they would have to

24   turn those funds back over.  And so documents were already

25   put into place that a homeowner would sign acknowledging

1    that.

2         Q.    Is one of the things you're -- because you've

3    already testified primarily what you were trying to do early

4    on is get the money to the homeowners as quickly as possible.

5    Was one of the things you were trying to do to figure out if

6    people were trying to steal money from the Road Home Program?

7         A.    That was another part of -- I testified earlier to

8    the whole action plan.  HUD always requires that.  In any

9    type of grant or program that you do you have to have a fraud

10   intervention or a department that specifically is making sure

11   that federal dollars are used for what they're intended and

12   what their purpose is for, that there's not waste nor is

13   there any type of criminal fraud going on.  So we did have a

14   department that did that.

15        Q.    After they gave out the money in 2007, let's say,

16   was there additional money that was given out or were people

17   notified of additional money they may be entitled to if they

18   were rebuilding their home through the Road Home Program?

19        A.    Yes.  Actually, several times the Road Home Program

20   has done that.  Again, big storm.  Nobody has a clue of

21   really how much money is going to be needed.  We didn't get

22   all -- the State of Louisiana did not get all the money at

23   one given time.  There were a lot of applicants.  The design

24   was to help those people who suffered from Katrina and Rita.

25   And as we continue to evaluate the program, there were some

1    things that were put on hold.  Elevation grants were one

2    thing that was always intended but the State didn't think

3    there was going to be enough money.

4              THE COURT:  What do you mean by elevation grants?

5              THE WITNESS:  Part of the Road Home grant that

6         we've been talking about is divided up into four

7         different grants.  Elevation is one component.  There

8         was a $30,000 incentive grant for homeowners to elevate

9         their home.

10             THE COURT:  Build it up.

11             THE WITNESS:  To build it up.

12   BY MR. WALKER:

13        Q.   Raise it up high, put it on pillars of some kind.

14        A.   Sure.  Yes.  And so that was put on hold until

15   April of 2008.  And so once the State received more money,

16   Congress appropriated additional funds.  That part of the

17   program was reinitiated, reimplemented.  And we sent out

18   letters to people that would be eligible for the elevation.

19   Obviously had to be in a flood plane.  Not everyone was

20   eligible for it.  But homeowners that responded were then

21   processed for that grant.

22        Q.   Did the people who were entitled to the elevation

23   grant also have to be option one applicants for the original

24   money?

25             THE COURT:  I have no idea what that means.

```
 1            MR. WALKER:  I'm getting to it.  I asked that and
 2        then I'm going to explain it.
 3            THE COURT:  All right.
 4   BY MR. WALKER:
 5        Q.   Is that true?
 6        A.   Yes.
 7        Q.   So, as you testified previously, you said option
 8   one were the people who intended to either rebuild the home
 9   or repair the home and stay in their home post Katrina?
10        A.   Yes.
11            THE COURT:  Post Rita.
12            MR. WALKER:  I'm sorry.  Post Rita.
13            THE WITNESS:  Rita or Katrina, yes.
14            THE COURT:  We don't care about Katrina here.  We
15        only care about Rita.
16            MR. WALKER:  I care about all of them, but that's
17        okay.
18        A.   Yes, that is the option one.  We didn't mention,
19   I've tried not to make it as complicated, I realize, option
20   twos and threes.  But that was basically where the homeowner
21   had the ability to sell their home to the State.  Most people
22   did not choose that option.  The majority chose option one,
23   to reoccupy their home.
24   BY MR. WALKER:
25        Q.   So if a person had filled out and gotten money to
```

1    rebuild their home, later y'all came back, in 2008, and said

2    we'll give you an additional $30,000 for you to elevate this

3    home so the next flood won't wipe you out?

4         A.   Correct.

5         Q.   And, basically, that was done so that when the next

6    hurricane hits the water will go under rather than through,

7    hopefully?

8         A.   Right.  Preventative measures.

9         Q.   And in 2009 was there yet additional money that

10   y'all were able to give out to people who, again, were option

11   one people, that is they were people who were rebuilding or

12   repairing their homes?

13        A.   Yes.

14        Q.   How much money were they able to get?

15        A.   What we did there in 2009, the program had another

16   grant.  So we had the Road Home grant and I said the

17   elevation.  There was also what we called the additional

18   compensation grant.  That grant was designed for individual

19   homeowners that were low to moderate income.  It was to give

20   additional assistance recognizing they had a greater recovery

21   need.  It was capped, again, a lot of the program was capped

22   because of funding constraints, to $50,000.  In 2009 we were

23   able -- we received additional funding.  We were able to

24   remove that cap and so that if there was still recovery needs

25   that option one homeowners that wanted to reoccupy we could

1    extend and go above the 50,000.

2        Q.    Okay.  We talked about the fact that you're the

3    custodian of records for the Road Home Program; is that

4    correct?

5        A.    Yes.

6        Q.    Did you have occasion to obtain and view the file

7    for Adley Leo Dyson, Jr.?

8        A.    Yes.

9        Q.    Now, you said that each person who applies there's

10   a file that's kept; is that correct?

11       A.    There is, yes.

12       Q.    I want you to open up that binder and look at the

13   one that's right behind United States Exhibit 1, and it's

14   already been introduced.  I'm not going to ask you specific

15   questions about United States Exhibit 1.  I simply want to

16   ask:  Is that the complete file on Adley Dyson, Jr.?

17       A.    I'm not looking at every page either, but yes.  I

18   can tell there's seven pages of the actual application.

19   Closing documents are in here as well.  There are covenants

20   that they would have recorded.

21       Q.    Actually, you supplied that to us, didn't you?

22       A.    Yes.

23       Q.    You are the one who gave us United States

24   Exhibit 1, all those documents in the binder?

25       A.    Yes.  Exhibit 1 looks like it has his application,

1    closing documents, checklist, his benefit selection form, his

2    application, his document for elevation grant for additional

3    compensation.  Yes --

4            THE COURT:  Yes or no.

5      A.   -- it looks like it's all in here.

6            THE COURT:  Yes or no.

7      A.   Yes.

8    BY MR. WALKER:

9      Q.   Okay.  And that's fair enough.  You provided the

10   document that's been introduced.  I simply wanted you to kind

11   of thumb through it.  Okay.  Now, the next document I'm

12   actually going to be showing you on that screen that's right

13   next to you and it's also going to be appearing on the big

14   screen because it's already been introduced.

15      When the person did the original application, you said

16   before they initialled the document; is that correct?

17      A.   Yes.

18      Q.   And that's when they go and they talk to the case

19   manager, correct?

20      A.   That's right.

21      Q.   I'm going to go to United States Exhibit 2.  And

22   you can see that at the beginning the applicant name, Adley

23   Dyson, Jr.; is that correct?

24      A.   Yes.

25      Q.   I'm going to go down to Page 5 of that document.

1    So I'm going to start with Page 5 of the document and I'm

2    going to -- okay.  Do you see -- do you recognize -- first of

3    all, is that the computer document that was filled out by

4    Mr. Dyson?

5         A.    Yes, that's the document that would have been

6    completed and submitted when he came in for his appointment.

7         Q.    And you can see Mr. Adley L. Dyson, Jr., that is

8    the applicant information?

9         A.    Correct.

10        Q.    You talked about the fact that he initialled it.

11   Are those the initials that are at the bottom of the page?

12        A.    Yes.

13        Q.    And they -- let's see.  On the second page, does it

14   list out his e-mail address?

15        A.    That's his contact information that would be

16   provided.

17        Q.    Does it list out his current address where he's

18   living or a relative's address?

19        A.    Yes.

20              THE COURT:  Which one?

21              THE WITNESS:  Got the relative information there

22        they could provide, or a friend.

23   BY MR. WALKER:

24        Q.    And in this case he provided his farther's address,

25   Mr. Adley L. Dyson, Sr.?

 1      A.    Sr., yes.

 2      Q.    And it says eligibility information.

 3      A.    These are the questions that I referred to earlier

 4  related to eligibility.

 5      Q.    "Was your home a single or double unit?"

 6      A.    That was the structure type that I talked about as

 7  one of the criteria.

 8      Q.    Okay.  And "Was your home damaged or destroyed by

 9  Hurricane Katrina or Rita?"

10      A.    That's the second requirement.

11      Q.    "If the hurricane affected your property, did you

12  own the home on the date the storm hit," on either

13  August 29th of 2005 for Katrina or September 24th for Rita?

14      A.    That's the ownership requirement.

15      Q.    And for each of those he said yes?

16      A.    Yes.

17      Q.    And he initialled it?

18            THE COURT:  Is there an answer to that question?

19      A.    Yes.

20            THE WITNESS:  I'm sorry.

21  BY MR. WALKER:

22      Q.    Does it list out the damaged residence?

23      A.    Yes, 147 John Street.

24      Q.    In what city?

25      A.    In Cameron, Louisiana.

1    **Q.**   And again, let's see, was it damaged -- "Was it on
2    the flood plane, the damaged property?"  What did he say to
3    that?

4    **A.**   Yes.

5    **Q.**   What did he say he intended to do?  Did he intend
6    to keep the home or get rid of it?

7    **A.**   To keep the home.

8    **Q.**   "Was the home your primary residence on the date of
9    the storm?"  What did he say to that?

10    **A.**   Yes.  That's the occupancy requirement.

11    **Q.**   And "Did you register with FEMA for assistance?"

12    **A.**   Yes, and that would be the fifth requirement.

13    **Q.**   And did he -- after answering that, did he initial
14    the bottom of that page?

15    **A.**   Yes.

16    **Q.**   Did he talk about the fact that he received FEMA
17    money?

18    **A.**   Yes.  That's the first question up there.

19    **Q.**   And how much did he say he got?

20    **A.**   10,500.

21    **Q.**   And with this page, like all the other pages, did
22    he initial the bottom of the page?

23    **A.**   Yes.

24    **Q.**   On the final page, on the next page, do you
25    remember you talked about the fact that there was a place

1  where the person could, essentially, put in anything they

2  wanted to, any other information the person -- the applicant

3  told them?

4        A.    Yes.   That's the comments section.

5        Q.    So what I'm going to do is blow that up a little

6  bit more because nobody can read that.   So are these the

7  comments that the case manager wrote down as she was

8  interviewing Mr. Dyson?

9        A.    Yes.   Those would be questions that she would have

10  asked or would have been provided based on going through the

11  application.   So where it says, like, homeowner didn't have

12  the homeowner or flood insurance to date.   He self-certified

13  his FEMA number.   She just walks through and puts those.

14  There's no mortgage on the property.

15        Q.    Talked about, look at the bottom, missing

16  documents, FEMA I.D., award letter, and utility occupancy.

17  Do you know what utility occupancy means?

18        A.    Yes.   That would be being able to show evidence

19  that you were occupying the property at the time of the

20  storm.

21        Q.    That's one of those things that y'all required a

22  person to do?

23        A.    Correct.

24        Q.    And then on the last page of the document is the

25  person required to sign?

1      A.   Yes, sign and date it.

2      Q.   And is that a certification that the things he said

3  in the document are true and correct?

4      A.   Yes.  That's what the case adviser is trained to

5  do, is walk through it and then, once he verifies everything,

6  to put a signature and date it.

7      Q.   At the time of the application is a photograph of

8  the person's license taken?

9      A.   Yes.

10          THE COURT:  What kind of license?

11          MR. WALKER:  Driver's license.

12          THE COURT:  Okay.  Are you testifying to that or is

13      the witness testifying to that?

14          MR. WALKER:  I'm asking.

15  BY MR. WALKER:

16      Q.   Was one of the things they required, and you

17  previously testified to this, that they would try to get an

18  image of the person; is that correct?

19      A.   Yes.  When the person came in we not only took a

20  picture, we got a copy of their driver's license, also took a

21  thumbprint, fingerprint.

22      Q.   Is this the image of the driver's license in the

23  Adley Dyson case?

24      A.   Yes, it is.

25      Q.   And I believe you also testified --

1              MR. WALKER:  That is United States Exhibit 3, for
2        the record, Your Honor.
3    BY MR. WALKER:
4        Q.   Did you also testify that they took an image of the
5    person as he came into the actual center?
6        A.   Yes.  While they were waiting for the appointment
7    they would take the picture.
8        Q.   And I show you United States Exhibit 4.  Was that
9    photograph in connection with the Adley Dyson file?
10       A.   Yes, it is.
11       Q.   Is that the photograph that was taken at the Road
12   Home Center?
13       A.   Yes, this would have been at the center.
14       Q.   Now, you talked about and talked about kind of at
15   length about the fact that a person had to have documents to
16   verify that they lived at the location at the time that Rita
17   hit.
18       A.   Correct.
19       Q.   And do you remember testifying about the -- that a
20   utility bill was one of the things you could use?
21       A.   That was one of the means, yes, it was.
22       Q.   I'm showing you United States Exhibit 5.  First of
23   all, do you know what this document is?
24       A.   This is the checklist that the adviser -- the case
25   adviser at the time of the appointment would fill out in case

1    the homeowner came in and didn't have everything.  We wanted

2    to give them sort of a checklist that they could take with

3    them to say here's the documents we'll still need to get in

4    order to finish processing your application.

5         **Q.**    I'm looking at the top of the document.  Does it

6    list out who the homeowner is?

7         **A.**    Yes, Adley Dyson.

8         **Q.**    And the case manager?

9         **A.**    Cynthia Hawkins.

10        **Q.**    Now, you talked about the fact that it lists out

11   the things that the person would need.  I'm showing you the

12   center of the document.  Can you tell us what that is?

13        **A.**    That's the checklist of different documents that

14   would be required to determine eligibility.  In this case,

15   obviously, looks like there's a couple that are checked.  The

16   FEMA I.D.  The application earlier said it was just

17   self-certified.  So getting a copy of that.  The income

18   documentation.  In order to do the additional compensation

19   grant you had to show check stubs that you were low to

20   moderate income.  So that was checked off.  Then it looks

21   like they hand wrote the utility bill.  That should be 9/25.

22   So it would have been for the date of Rita in the month of

23   September.

24        **Q.**    When a person delivers a document for -- to

25   demonstrate the utility, is that something that's placed in

1    the file when they deliver it?

2         A.   Yes.  Everything is uploaded into the system.

3         Q.   I'm going to the third page of United States

4    Exhibit 5.  Was this a document that was in his application

5    for the Road Home grant?

6              THE COURT:  Whose?

7              MR. WALKER:  Mr. Dyson's application for the Road

8         Home grant.  Terrible use of pronouns.

9         A.   Yes.

10   BY MR. WALKER:

11        Q.   And what, if anything, does it show related to the

12   electricity?

13        A.   It's a letter from the utility company stating that

14   their records show that there was -- the connection date and

15   the disconnection of electrical services.

16        Q.   Now, in this case it shows the disconnect date of

17   8/31 of '05.  That was just a little bit before, actually,

18   Rita hit; is that correct?

19        A.   That is correct.

20        Q.   Do you know why they would have accepted this as

21   demonstration that he resided in the location?

22        A.   More probably just out of numerous applications

23   that were Katrina, somebody looked at this and saw 8/31/05

24   for Katrina and accepted it.  In actuality, they should have

25   looked for September.

1          THE COURT:  Wait.  Katrina or Rita?

2     BY MR. WALKER:

3          Q.   I'm going to ask it in three parts so it will be

4     easier to understand.  Katrina hit on 8/31 of 2005; is that

5     right?

6          A.   Correct.

7          Q.   And Rita hit in September?

8          A.   Correct.

9          Q.   The document that was submitted by Mr. Dyson that

10    was in the file shows that his electricity was turned off at

11    8/31/05, which would have been the date that Katrina hit?

12         A.   That is true.

13         Q.   The fact that you said previously, your testimony

14    was, it was simply a mistake.  They looked at it.  Were all

15    of the files -- essentially, were people being overrun with

16    these files and they were having to check these documents to

17    verify occupancy?

18         A.   Yes.  And in actuality, too, he could have suffered

19    damage from Katrina just because in Cameron there were people

20    who suffered damage from Katrina.  So had he had it turned

21    off there, that wouldn't necessarily be an error.  That's

22    probably why it was accepted.

23         Q.   I'm showing you United States Exhibit 6.  Were

24    there documents --

25         THE COURT:  I want to take a 10 minute recess.

1            MR. WALKER:  Yes, Your Honor.

2                    (Recess is taken.)

3            THE COURT:  Mr. Walker.

4    BY MR. WALKER:

5        Q.   Previously, I just showed you that letter from the

6    Jeff Davis Utility Co-op.  Remember seeing that?

7        A.   Yes.

8        Q.   And I just pulled up United States Exhibit 6.  Were

9    there authorizations people had to give so that y'all could

10   go out and obtain information about them?

11       A.   Yes.  They would sign the authorization to release

12   information at the initial appointment so that we would be

13   able to verify numerous things related to the application.

14       Q.   Essentially, they need -- do you need their

15   authorization to obtain personal information about where they

16   live and other records?

17       A.   Information if we were going to contact the utility

18   company or if we were going to contact an insurance company.

19   We would have to fax this in before those companies would

20   release information to us.

21       Q.   And I'm going down to the third page of this.  Was

22   there a Road Home applicant certification that had to be

23   signed by the applicant at the initial meeting with the case

24   manager?

25       A.   Yes.  As part of the application, they sign the

1  certification that all of the information that they have

2  shared with us during the appointment was correct and

3  accurate to their knowledge.

4      Q.   And on the document itself, can you read what the

5  first paragraph says?

6      A.   "The undersigned agrees and acknowledges that the

7  information provided in this application is true and

8  correct --

9          THE COURT:  Slow down, please.

10     A.   -- is true and correct as of the date set forth

11 opposite my signature and that any intentional or negligent

12 misrepresentation of that information contained in this

13 application may result in civil liability, including monetary

14 damages, to any person who may suffer any loss due to

15 reliance upon any misrepresentation that I have made on this

16 application and/or in criminal penalties, including but not

17 limited to fine, imprisonment, or both under the provision of

18 Title 18 United States Code Section 1001."

19     Q.   And in the second paragraph does it also -- so it

20 talks about the federal criminal statutes that one may be

21 violating.  Does the second paragraph of the applicant

22 certification talk about state criminal violations you will

23 suffer if you intentionally make a false statement on that

24 document?

25     A.   Yes, it cites the Louisiana Criminal Code.

1      **Q.**    Theft and identity theft and forgery?

2      **A.**    Yes.

3      **Q.**    And did Mr. Dyson print and sign his name to that

4      document?

5      **A.**    Yes, his signature and printed name is there with

6      the date.

7      **Q.**    And that's the same date that he filled out all the

8      other documents with the case manager?

9      **A.**    Yes.  His appointment was August 10th of 2007.

10      **Q.**    Now, you talked about the fact that there was the

11      inspector who went out and inspected the location.

12      **A.**    Yes.

13      **Q.**    And was there an inspector who went out and

14      inspected the 147 John Street location?

15      **A.**    Yes.  There's documentation in the file to certify

16      that.

17      **Q.**    I show you United States Exhibit 7 and ask if you

18      recognize that document.

19      **A.**    I do.  That is the document that is created after

20      the inspector has gone out into the home.  It's titled the

21      "Technical Compensation Allowance Document."

22      **Q.**    Is it based on information the inspector submits?

23      **A.**    It is, yes, and the applicant.

24      **Q.**    And the applicant.  So, for instance, if the

25      applicant says that his house is 2,000 square feet and

1   there's no house available to measure, will that be in that
2   document?
3       A.   Yes.   The unit area, it's kind of halfway down
4   there, will list out the square footage amount.
5       Q.   That's this right here I just put my little marker
6   over, says unit area SF 2,000 square feet?
7       A.   Right.   Yes.
8       Q.   And connected to that document, is there a
9   photograph that shows the place that the inspector took a
10  picture of?
11      A.   Yes, it's in the document as well.   I think it's
12  two more pages.   That's what we were referring to earlier,
13  that every place they would have gone out to they would have
14  taken a picture.
15      Q.   So Mr. Dyson's residence, 147 John Street in
16  Cameron, Louisiana, when he went to that location, basically,
17  he found a field?
18      A.   There's nothing there, yes.
19      Q.   And so, based on the document, there would be no
20  way for the person to independently verify the square footage
21  of that house?
22      A.   Not when the slab's not there a year later.   That
23  would have been impossible.
24      Q.   It's not like y'all were trying to -- it's not
25  like -- I may be going right back so you might as well leave

1    it down.  It's not like y'all were trying not to verify that

2    people owned the property and lived in a location; is that

3    correct?

4        A.   Not at all.  Most people would tell you we were

5    doing everything we could to verify and try and collect

6    documents.  And, obviously, that delayed being able to get

7    payments out.

8        Q.   Is one of the -- in terms of the documents

9    connected to his application, this is United States

10   Exhibit 8, did y'all go to the Cameron Parish police jury?

11       A.   The applicant would have gone and provided it, the

12   information that was requested to try to verify that -- the

13   occupancy in question.

14       Q.   And it says Adley Dyson is located at 147 John

15   Street in Cameron?

16       A.   Right.  We would have used that document to support

17   occupancy.

18       Q.   Would you have also used information from the tax

19   assessor's office?

20       A.   Yes.  The tax assessor's office is what we would

21   use to verify ownership.  And if there was a homestead, we

22   would have used that for the occupancy.  I think this one is

23   just the real estate.  It's not the homestead.

24       Q.   And, in fact, it shows -- when you look at the

25   bottom right-hand corner of it under homestead it says none?

1      A.   Correct.

2      Q.   Do you see none on the bottom right?

3      A.   Yes.

4           THE COURT:  Wait.  You went too fast.  Can you do

5      that again, please, Mr. Walker.

6  BY MR. WALKER:

7      Q.   When you look at the bottom corner, you're aware

8  there's a place on the document that would be where you put

9  the homestead exemption?

10     A.   Right.  He didn't have a homestead exemption which

11 is why the utility bill was required or trying to go to the

12 police jury to get the letter that we just saw.

13     Q.   And did you also have -- did you also obtain

14 something from the parish registrar of voters?

15     A.   Yes.  The applicant, again, would have provided

16 this.

17     Q.   That's not something where y'all are independently

18 going to the Cameron Parish Registrar of Voters?

19     A.   No, no.  That's what I said earlier.  We were

20 trying to go as fast as we could, and we were using the

21 homestead exemption.  When we had the homestead exemption,

22 that was -- again, it's not a hundred percent proof; but

23 that's what we use for validation for occupancy.  When we

24 don't have that, in this case, in Mr. Dyson's file we didn't

25 have it, so the homeowner would have had to go and try to

1    collect these documents to turn in.

2        Q.    Now, you testified to the fact that when you

3    received -- that after you received these documents you did a

4    closing; is that correct?

5        A.    Yes.

6        Q.    And there are closing documents?

7        A.    There are closing documents in the file.

8        Q.    I'm going between two different things.  I'm trying

9    to go quickly, but at the same time I'm trying to make sure

10   that it's easy to understand what I'm saying.  I'm showing on

11   this document -- this is United States Exhibit 9.  Is this

12   the closing documents associated with the case?

13       A.    Yes, that's one of the documents.  That's actually

14   his benefit selection form.  Those who participated in it

15   knew it came in the mail.  This would have been mailed to

16   him.  It's called the gold letter, that the homeowner would

17   select what option, where he -- Mr. Dyson has selected option

18   one to stay in my home.  And then it tells him what his

19   compensation grant amount would be and the elevation amount

20   as well as the additional compensation.  So it spells out

21   those three different grants that we talked about earlier.

22       Q.    And you see his name at the top of it, Adley Dyson,

23   Jr.?

24       A.    Yes.

25       Q.    You see the 147 --

1      A.   And the address, the damage address, is on there.

2      Q.   And in terms of the money that he was originally

3   getting, how much was he originally getting?

4      A.   The total benefits there would have been --

5           THE COURT:  I can't see that.  Can you see that?

6           THE WITNESS:  At the --

7           THE COURT:  Can we highlight something?

8           MR. WALKER:  I can actually do this.  If I blow it

9      up piece by piece then it will be bigger.

10          THE COURT:  Good.  I like bigger.

11  BY MR. WALKER:

12     Q.   So we'll talk about the first part of it.

13     A.   The first part is the compensation grant.  That's

14  the $38,150.  The second part is the second grant award, the

15  elevation grant, which was the $30,000.  And then the third

16  portion there is that additional compensation grant that we

17  talked about regarding applicants or homeowners that were low

18  to moderate income, and the total there 118,150.

19     Q.   So that's how much money he was entitled to?

20     A.   Yes.

21     Q.   He didn't get all that money at first, did he?

22     A.   No, because, remember I said earlier, elevation was

23  put on hold.  He was eligible for it; but at his first

24  closing, when you look at the closing documents, we were not

25  dispersing that until we were sure that the State would have

1    enough money.  That was later.

2        Q.    So the total amount he actually got in the original

3    Road Home money was $88,150?

4        A.    It would have been the 38,150 plus 50.  So, yes,

5    88,150 would have been the initial closing.

6        Q.    And you can see where he printed his name and

7    signed his name as the applicant?

8        A.    Yes, at the very bottom.  This is what he would

9    have mailed back in to us to start the closing.

10       Q.    Attached to the closing was the Jeff Davis Electric

11   Company document?  Was it attached?

12       A.    It is in there, yes, a few more pages.  You're

13   looking at his HUD settlement right now.  There it is.

14       Q.    You see that was a part of the closing, too?

15       A.    Correct.

16       Q.    Was that because it was a verification of the fact

17   that he lived there?

18       A.    It was one of the eligibility verifications.

19   That's what was used for his occupancy.

20       Q.    I'm directing your attention to Page 19.  Is there

21   a certification that was a part of the closing?

22       A.    Yes.  There's -- actually, as we're seeing you

23   scroll through, there's several different documents that make

24   up the closing package.  This particular one we're looking

25   at, section three, this is the grant certification; and it's

1    the last portion of it where they are -- again, because we

2    weren't able to verify everything 100 percent accuracy, the

3    program had the homeowner assert and certify to the

4    information that they had given us acknowledging that they

5    were actually an owner occupant at the time of the storm.

6        Q.   And not just an owner occupant; is that correct?

7             THE COURT:   What does that mean?

8    BY MR. WALKER:

9        Q.   Do you see where it says "and that the homeowner's

10   application was a direct result of the declared disaster and

11   they have disclosed all proceeds and funds received"?

12       A.   Right.   I mean, we spelled out that all the -- had

13   them certify the different eligibility requirements again.

14   And, really, not only this document but numerous documents

15   had that certification language because from the time of the

16   initial application to the time of closing they could have

17   received insurance proceeds.   And so that's what that

18   statement is for, that before they went to closing we were

19   asking that question again, "have you received any additional

20   money before you close on your Road Home grant," because it

21   would affect the grant amount.

22       Q.   And can you read the part -- can you read the

23   sentence that begins with "Homeowner acknowledges that

24   homeowner may"?

25       A.    "Homeowner acknowledges that the homeowner may be

1    prosecuted by federal, state and/or local authorities in the

2    event that the homeowner or homeowners make or file false,

3    misleading and/or incomplete statements and/or documents."

4    And that was because we didn't go back and check when

5    homeowners gave us documents like a utility bill.

6        Q.   And on the bottom of Page 20, do you see where

7    there's -- the bottom part has an affidavit?

8            THE COURT:  Okay.  Define affidavit for us, please.

9    BY MR. WALKER:

10       Q.   Do you see at the bottom where, again, the

11   homeowner certifies that he's subject to federal prosecution

12   if he's not honest and truthful?

13       A.   Yes.  It's the last few -- well, that whole

14   statement; but the last few sentences are where it discusses

15   that, how it will be handled through the office of fraud to

16   address such issues.  Again, that was their grant -- the

17   title of it, what you sign, is the "Grant Recipient

18   Affidavit" where they would -- all of those things --

19   statements were related to ownership, occupancy, eligibility

20   requirements, as well as understanding that this grant was

21   for damages related exclusively to Hurricane Katrina or Rita.

22       Q.   And after they certify all that -- after he

23   certifies all that, was he required to sign this document?

24       A.   Yes, and it's actually notarized as well.

25           THE COURT:  He being whom?

1           MR. WALKER:  I'm sorry.

2      A.   The applicant, Mr. Dyson, would have been --

3  certified that and signed that in the presence of a notary.

4  BY MR. WALKER:

5      Q.   We talked about the fact that there was this --

6  originally you couldn't pay the elevation grant; but later,

7  money was released so you were able to pay an elevation

8  grant.

9      A.   Correct.  That came in April of 2008.  We mailed

10  out letters to applicants that we already knew, potentially,

11  were eligible for the grant money based on the location of

12  their property.

13     Q.   And would it also be based on the fact that they

14  had already received money -- they'd already applied for and

15  received money from the Road Home Program?

16     A.   Yes.  They had to be an option one.  The options,

17  we didn't get into them.  Again, we don't want to complicate

18  it.  But the twos and threes where they sold their property,

19  the State said they would not be eligible for the elevation,

20  just option one.  And Mr. Dyson chose that option.

21     Q.   So if you owned your property and you rebuilt your

22  property and were going to stay there then you could get the

23  elevation grant, too?

24     A.   Yes.  You had to be in the base flood elevation,

25  but it wasn't for every option one.  There were about 35,000

1   option one applicants that were actually eligible for it.

2       Q.   And are you aware of the fact that Mr. Dyson got a

3   letter talking about the fact that the funds were now

4   available for elevating his home?

5       A.   Yes.  That's in the file.  We sent -- that's the

6   interest letter that we sent out to all of those applicants

7   informing them about the Road Home's elevation incentive as

8   well as another program that you see there, the State's --

9   state hazard mitigation grant program to see what their

10  interest would be in the program, and they were required to

11  turn in a form by a certain date expressing whether they were

12  or not interested.

13      Q.   And did you actually attach the form to the back of

14  this letter so if there were interested in it they could fill

15  it out?

16      A.   Yes, it was in the letter.  Would have had a return

17  envelope as well.

18      Q.   Is that the second page?  I'm going to blow it up.

19  I know it's really difficult to read now because it's too

20  big.  But generally, is that the second page of the letter

21  which is the form the person could fill out and send back?

22      A.   Yes.  And, basically, it's just asking them if

23  they -- making sure they still own the property, that they've

24  not sold it, are they interested or not interested.  If they

25  were interested, it asked them some additional questions

1      about the property.  Should be the middle section.  Because

2      the -- and those are just getting more to the -- remember,

3      earlier my testimony we talked structure type was one of the

4      requirements.  We did allow single family mobile homes to

5      close, but their elevation grant was only 20,000.  So that's

6      what -- this is having, again, the homeowner self-certify.

7      If we did not know the type of structure, they were

8      certifying what the structure was.

9          Q.   I'm now going to United States Exhibit 11.  That

10     was United States Exhibit 10.  I believe I said it; but if I

11     didn't, that was United States Exhibit 10 we were just

12     speaking of.  Do you know if he responded and sent a letter

13     back after receiving that elevation grant letter?

14         A.   Yes, he sends the form back, not a letter.  He

15     completed the form.

16         Q.   Mr. Dyson?

17         A.   Mr. Dyson, that he had a single wide mobile home on

18     land and signs it and dates it September 22nd of 2008, and

19     that he was interested in receiving this grant.

20         Q.   And does it list out his telephone number and a

21     cell phone number?

22         A.   Yes.

23              THE COURT:  Say that again.

24     BY MR. WALKER:

25         Q.   Does it list out Mr. Dyson's telephone number and

1      cell phone number so he can -- so Mr. Dyson can be contacted

2      in connection with receiving this additional money?

3          A.   It does.

4          Q.   Was there -- in fact, did he receive money as a

5      result of that?

6          A.   He did.  He received the full $30,000.  That's

7      coming up.

8          Q.   Is that United States Exhibit 12?

9          A.   It is.  That's called the final acknowledgement

10     form.  Once a homeowner closes with the Road Home Program,

11     they didn't have to come in for another closing.  They could

12     do what we called a mail away closing.  We would send them

13     that letter.  They would sign it.  It would give the amount

14     that they'd previously closed on.  That's the 88,150.  And it

15     tells you the type of awards he'd received, compensation and

16     additional compensation.  And then he gives -- the middle

17     part gives the actual amount of the elevation.

18         Q.   And so he gets an additional $30,000?

19         A.   Correct.

20         Q.   Did he have a specific amount of time to comply

21     with the elevation?

22         A.   Yes.  The elevation grant, much like the

23     compensation grant, had an agreement, a covenant with it.  It

24     was called the Elevation Incentive Agreement, what we're

25     looking at, where it specifies what these funds are to be

1    used for.  They were specifically to be used for elevation

2    purposes, and they had to not have been elevated.  They

3    certify to that.  That's one of the statements in here.

4    Because we didn't go out and check was the property already

5    elevated or was it not.  We were basing it on what we knew

6    the flood plane was.

7         Q.    And do you know if Mr. Dyson signed the bottom of

8    the document and also submitted wiring information to have

9    the money wired to his account?

10        A.    Yes.  The bottom of the document has Mr. Dyson's

11   signature and dated July 31st, 2008 with the request to have

12   it wired to his account at Capital One Bank.

13        Q.    Does it list out the routing information associated

14   with the wiring?

15        A.    It does.  Don't ask me to read the number.

16        Q.    And based on your knowledge of the entire file, was

17   the money -- that additional $30,000 wired to his account at

18   Capital One as a result of this request?

19        A.    Yes.  Our documentation shows that the money was

20   wired to that account.

21        Q.    Toward the end of 2009, I believe you previously

22   testified to the fact that the cap on what people could

23   receive -- essentially, Congress gave you a certain amount of

24   money.  You'd run out of money and then they gave you some

25   additional money so you could continue to give money in the

1   Road Home Program, additional money to repair or rebuild

2   their house?

3       A.   Right.  We constantly had legislators and people on

4   behalf of Louisiana, you know, going back to Washington on

5   behalf of those who had suffered loss from Hurricane Katrina

6   and Rita and, as a result, being able to get those additional

7   funds.  Also as a result, when we started monitoring and

8   doing some of the compliance, realizing that even though some

9   homeowners had received compensation grants, they were still

10  unable to rebuild.  So the whole intent of removing this cap

11  was to allow some additional funding to go out there so that

12  people could reoccupy their property, make it safer, stronger

13  and smarter, was our slogan.

14      Q.   Were the only people that were going to get this

15  additional money people that had been option one homeowners?

16      A.   Option one, and they had already received the

17  additional compensation grant.  He had received earlier that

18  $50,000.  So you had to have received that, and he was capped

19  at the 50.  So he was able to receive the additional amount

20  of money after that.

21           THE COURT:  Let's be specific about who he is.

22      A.   Mr. Dyson was able to.

23  BY MR. WALKER:

24      Q.   And so Mr. Dyson -- well, generally speaking, were

25  people who had been option one homeowners, that is people who

1    had said they wanted to rebuild or replace the home on the

2    property, were they able to get additional money through this

3    grant if they'd already received their $50,000?

4         A.   If they had.  We already knew the population

5    because we knew everyone who'd received the additional

6    compensation grant.  The limit or the cap of 150,000 never

7    went away.  So if he'd already received 150, it didn't

8    matter.  So we knew -- the Road Home Program knew what

9    applicants would actually be eligible or potentially eligible

10   for this additional money.  We had to send this letter out

11   because time had elapsed and you weren't eligible if you'd

12   sold the property or such.  And so they, again, were required

13   to sort of self-certify that they actually still owned and

14   were occupying it or still intending to occupy the property

15   to get it.

16        Q.   Mr. Dyson got one of these letters?

17        A.   He did.

18        Q.   But for the fact that Mr. Dyson had originally

19   applied for the Road Home money, would he ever have gotten

20   this letter?

21        A.   No.

22        Q.   But for the fact that he originally received

23   $50,000 as a result of applying for the Road Home grant,

24   would Mr. Dyson have ever gotten this letter?

25        A.   No.  Again, it was for the people who'd already

1    been determined that they were low to moderate income and had

2    received the additional compensation grant.

3        Q.    Is this the beginning of the letter, "You may be

4    eligible for an additional ACG payment"?

5        A.    Yes, it is.

6        Q.    Do you see who it's addressed to?

7        A.    It's addressed to Mr. Dyson.

8        Q.    And the address?

9        A.    It is the 147 John Street, the damaged address.

10       Q.    Cameron, Louisiana?

11       A.    Cameron, Louisiana.

12       Q.    And do you see the amount of money that they have

13   estimated he can receive?

14       A.    Yes.  It was estimated that he would be able to --

15   because he's going to cap at the 150 so his remaining balance

16   was -- that's where the 31,850 is coming from.  It's just the

17   balance from what he'd already received and what would be

18   left to get him to the 150, Mr. Dyson.

19       Q.    I show you United States Exhibit 15.  Did Mr. Dyson

20   return the attached fill-in-the-blank document associated

21   with this letter that you just read indicating a desire to

22   get that additional money?

23       A.    He does.  All the letters that we sent, obviously,

24   we put a form in there to make it more accessible and easier

25   for the homeowner just to fill out.  But this is the form

1    with Mr. Dyson as the applicant at the top, and it's dated

2    for November 9th, 2009, for Cameron Parish.  He signs it.

3    And then again, there are going to be some questions where

4    they make self-certified statements.  He's able to also

5    verify that the funds that he has already received and that

6    he has not received any more insurance.  He agrees to those

7    things.  We asked him to verify he still owns the property.

8    We didn't go back and pull title again.  And that was just,

9    again, to move the program forward to use the title we had.

10   He certifies his income.

11              THE COURT:  Mr. Walker, please ask questions.

12              MR. WALKER:  Yes, Your Honor.

13   BY MR. WALKER:

14       Q.   You see the applicant certifications that are

15   listed?

16       A.   Yes.

17       Q.   Were those -- did he have to certify each and every

18   one of those before the money could have been disbursed to

19   him?

20       A.   Yes.  We had to have initials on each of those or

21   it would have been sent back to the applicant, Mr. Dyson, to

22   complete.

23       Q.   And I'm looking at the last page of this document.

24   One second.  Did Mr. Dyson certify that the information was

25   true and complete?

1      **A.**   He does.  That's the first statement, again, is one

2   of our certifications that list out the Louisiana criminal

3   law.

4      **Q.**   Did he sign the document and was it -- was it

5   notarized by a notary public?

6      **A.**   It's signed and notarized on the 9th of November,

7   yes.

8      **Q.**   And in connection with that, did Mr. Dyson send

9   wiring instructions on where to send his money?

10      **A.**   Yes.  If the homeowner didn't want a check, they

11   would provide that information.  And it's the same bank

12   account that had previously been wired to at Capital One.

13      **Q.**   Mr. Dyson included documents related to wiring,

14   including the routing number and the account number; is that

15   correct?

16      **A.**   Yes, it is.

17      **Q.**   I'll show you United States Exhibit 16.  Is this

18   document a feed that just shows that the money was sent to

19   him at his Capital One account?  I know that's hard to read.

20          THE COURT:  Did you say a feed, F-E-E-D?

21          MR. WALKER:  F-E-E-D.  I only say that because

22      that's what the document's titled, Your Honor.

23          THE COURT:  Okay.

24          MR. WALKER:  Actually F-E-D.

25          THE COURT:  Ah.

1    BY MR. WALKER:

2         Q.   Do you see the amount?

3         A.   Yes.  The amount is -- it's in the box at the very

4    top left-hand corner, the $31,850, and then gives the --

5         Q.   You see --

6         A.   -- routing number as the reference number and the

7    bank account number.

8         Q.   And does it also give the date?

9         A.   Yes.  It was sent March 16, 2010.

10        Q.   So that 31,000 was wired to Mr. Dyson's Capital One

11   account on that date?

12        A.   Correct.

13        Q.   If Mr. Dyson had not lived in the residence 147

14   John Street, Cameron, Louisiana for the year prior to when

15   Hurricane Rita hit Cameron, Louisiana, would he have been

16   entitled to any Road Home money?

17        A.   No, he wouldn't.  The program, again, was

18   specifically designed for homeowners that experienced damage

19   as related to Hurricane Katrina or Hurricane Rita.

20        Q.   Go ahead.

21        A.   I was just -- that was really the -- appropriated

22   from Congress.  It was set up by HUD.  The State implemented

23   that program --

24             THE COURT:  Do we have to go through this, really?

25             MR. WALKER:  We don't.  I want to ask just two

1        questions.

2    BY MR. WALKER:

3        Q.   So, based on everything you observed, based on you

4    being the director of the Road Home Program, if he didn't

5    reside at the location the year prior -- for the entire year

6    prior to Rita --

7             MS. GIBBENS:  Your Honor, this has already been

8        asked and answered two seconds ago.

9             MR. WALKER:  That's true.  He did say yes.  I'll

10        strike the question.

11            THE COURT:  Thank you.  Sustained.

12            MR. WALKER:  Could I have one moment, Your Honor.

13            THE COURT:  Sure.

14            MR. WALKER:  I would tender the witness, Your

15        Honor.

16            THE COURT:  Ms. Gibbens.

17                      **CROSS-EXAMINATION**

18    BY MS. GIBBENS:

19        Q.   Good afternoon.  I'm a little old school.

20            THE COURT:  I understand.  Me, too.

21            MS. GIBBENS:  Good.

22            THE COURT:  I have no idea what they're doing so

23        pay no attention to the man behind the curtain.

24    BY MS. GIBBENS:

25        Q.   Mr. Harley, just for point of clarification,

1    Exhibit 1 you said was your file; but then we talked about

2    specific documents, Exhibits 2, 3 and then 5 through 15.  I'm

3    not so sure those were in Exhibit 1.  They might have been,

4    but I'm not so sure that they were.  Were those just pulled

5    out of your file but they were part of the Road Home file

6    also?

7         A.   Yes.  I just pulled them out, made them separate.

8         Q.   I just wanted to make sure we're all clear that

9    Road Home had all of those documents.

10        A.   Yes.

11        Q.   All right.  So Road Home had salaried employees and

12   then they also had subcontractors, also?

13        A.   Yes.

14        Q.   So, like, the inspectors, were they salaried

15   employees?

16        A.   Well, they would have worked with the contractor.

17   So whether they were hourly or salaried, I wouldn't know.

18        Q.   So you don't know whether they were paid by the

19   job?  You don't know that?

20        A.   No.  I think that they were --

21        Q.   You don't know?

22        A.   I would be thinking that they were salaried.  Yes.

23        Q.   But you don't know?

24        A.   I actually worked with one of the subcontractors

25   that did the inspections.  I was salaried.  I was not an

1    inspector before I went to work with ICF.  So that would have

2    been my assumption.

3         Q.   So you don't know?

4              THE COURT:  Let's not assume anything.  You know

5         what they say about assuming.  It makes an ass out of

6         you and me.

7    BY MS. GIBBENS:

8         Q.   So you didn't know.  We'll move on.  I'll assume

9    you don't know the answers for the other questions I had

10   about that either.

11        And you testified that this was a grant process and it

12   was very important to have a system of verification?

13        A.   Correct.

14        Q.   And so there were these procedures in place and you

15   went through them in detail, correct?

16        A.   Yes, ma'am.

17        Q.   And one of those requirements was that the

18   applicant had to prove ownership slash occupancy?

19        A.   Correct.

20        Q.   Two separate things?

21        A.   They had to be an owner of the property, but they

22   also had to be what we termed an owner occupant.  And the

23   distinction there would be my father was -- and I share

24   ownership in a home.  I'm not living there at the time of the

25   storm, but he was.  There had to be an owner who was also

1    living in the property.  You couldn't have an owner who had

2    rental property.

3        Q.   And this was at the time of Rita?  You needed to

4    prove this at the time of Rita?

5        A.   Yes.

6        Q.   And you could do this through a homestead

7    exemption?

8        A.   Correct.

9        Q.   And which would mean if they didn't have a

10   homestead exemption in 2005 you'd need -- they couldn't prove

11   occupancy that way?

12       A.   That's right.  That's the way that the program

13   attempted to verify it.

14       Q.   And you could verify occupancy by an electricity

15   bill --

16       A.   Correct.

17       Q.   -- at the time of Rita?

18       A.   At the time of Rita, yes, in the month of

19   September.  They would provide their utility bill.

20       Q.   Okay.  And so we went through the exhibits.  If you

21   need me to pull one I have them all right here, but it might

22   be a little quicker if we don't have to since I think you

23   just saw them.  But Exhibit 5 was the letter from Jeff Davis

24   Co-Op --

25       A.   Yes, ma'am.

1      Q.    -- and you recall seeing that and testifying about
2  that?
3      A.    Right.
4      Q.    And that letter said that Adley Dyson's electricity
5  was disconnected on August 31st, 2005, correct?
6      A.    Correct.
7      Q.    You also had the Exhibit 8, the tax assessor
8  documents, correct --
9      A.    Yes.
10     Q.    -- in your file?
11           And that said that the homestead exemption for 147 John
12  Street was zero for the year of 2005, correct?
13     A.    Yes.
14     Q.    Okay.  And now I'm going to turn to Exhibit 2.  And
15  I'll put this one up for you on the ELMO, hopefully.  This is
16  Exhibit 2.  You had already -- I'll show you the first page.
17  You had already explained that this was Mr. Adley Dyson,
18  Jr.'s application, correct?
19     A.    Correct.
20     Q.    So this is what he filled out with the case
21  manager?
22     A.    Yes.
23     Q.    And where it asks if you have an electricity
24  utility in your name on September 24th, 2005, it says other,
25  Jeff Davis electric company, correct?

1          A.   Correct.

2          Q.   He could have put yes?  That was an option, yes or

3    no or other?

4          A.   Yes.

5          Q.   And he put other, Jeff Davis Electric Company?

6          A.   Yes.

7          Q.   Okay.  And the home evaluation worksheet, you

8    talked about comments sections of different applications.

9    This is the home evaluation work order sheet.

10         A.   Correct, the work order.

11         Q.   This was also completed with the case manager?

12         A.   Yes.

13         Q.   Okay.  And on the adviser comments it says "Damaged

14   home was totally destroyed.  It was not a mobile home."

15         A.   Correct.

16         Q.   So that's the comment that the adviser would have

17   put in while conferring with Mr. Dyson?

18         A.   Correct.

19         Q.   Okay.  This form also has some questions.  It's --

20   at the bottom it says type of evaluation required and the

21   next page says 100 percent destroyed, correct?

22         A.   Yes, it does.

23         Q.   And right here it says "Is the house" -- well,

24   yeah -- "Is the house gutted?  Yes."  Correct?

25              THE COURT:  Is that right?

1      **A.**   Yes.

2   BY MS. GIBBENS:

3      **Q.**   And down here it says "Did flood waters enter the

4   house?  No."

5      **A.**   Correct.

6      **Q.**   And also on Exhibit 2, you spoke about title

7   searches.  This was in the Road Home file.  This is the no

8   match research checklist.  And it says that the researcher is

9   Wanda Haines, Wanda Haines?

10      **A.**   Yes, it is.

11      **Q.**   And it says that she is -- she's verifying title,

12   correct?  She's verifying --

13      **A.**   Yes.

14      **Q.**   And she has to verify that one applicant's name is

15   on the title?

16      **A.**   Correct.

17      **Q.**   And she verifies that she looked at this conveyance

18   letter of 1996, and she puts down that Adley Dyson, Jr. is on

19   the title?

20      **A.**   She does, yes.

21      **Q.**   Now, on this one I have a couple questions.  This

22   is -- well, let me go back real quick to Exhibit 5.  This is

23   also about the utility bill.  This is the adviser,

24   Ms. Hawkins, writes that she needs a utility bill before

25   September 25th because that's the date of Rita?

1    A.    Correct.

2    Q.    And Mr. Dyson would have gotten this?  He knew this

3    is what she needed, right?

4    A.    Right.

5    Q.    You need the utility bill for --

6    A.    That's what she would have asked for.

7          THE COURT:  Try not to talk over each other,

8    please.

9          MS. GIBBENS:  I apologize.

10   BY MS. GIBBENS:

11   Q.    So my next question is -- we're going to go back to

12   this elevation incentive form.  This was Exhibit 11 that you

13   just went over, and this was -- you've already explained what

14   it is.  I don't want to go over it all again.  But this is --

15   he's -- it's to raise your house, you know, so the water's

16   going to go under instead of through your house this time.

17   And so right here it says "Please confirm the type of

18   structure that was damaged in the storm," correct?  That's

19   what it's asking?

20   A.    Yes.

21   Q.    And he checks off mobile home on owned land, single

22   wide, right?

23   A.    Yes.

24   Q.    And this is April 22nd, 2008?

25   A.    Correct.

1      **Q.**   And are you aware that Mr. Adley Dyson, as of
2   April 22nd, 2008, had a single wide mobile home on that land?
3      **A.**   Based on that; but no, I'm not.
4      **Q.**   But that's what you --
5           THE COURT:  I didn't understand that answer at all.
6      **A.**   I mean, that's what that statement is.  It's saying
7   that that's what I have.  So yes.  I don't know what you were
8   asking.
9   BY MS. GIBBENS:
10     **Q.**   That's exactly what -- I'm very happy you answered.
11  That's exact -- he answered that this is what I have now.
12     **A.**   Right.
13     **Q.**   You were asking what did you have in 2005.
14     **A.**   No.
15     **Q.**   It asks the type of structure --
16     **A.**   Yeah, the damaged structure.  I'm sorry.  Yes.
17          THE COURT:  Okay.  We're going to cut this short
18      for the day because I'm losing my patience and I don't
19      want to do that.
20          MS. GIBBENS:  Okay.
21          THE COURT:  So everybody go home, rest.  Have a
22      good evening, everybody.  Thanks.  Bye.
23          Oh, by the way, if the attorneys don't talk to you
24      outside it's because they're not supposed to.  You might
25      be talking about the Panthers and, you know, the Super

1    Bowl; but people would think that you were talking about
2    the case.  So they will not be saying hey, good-bye, see
3    you later.  They won't be saying that to you so that we
4    don't get crossways.  Thank you.
5                    (Proceedings adjourned.)
6
7
8                        * * * * * * *
9
10
11                        CERTIFICATE
12
13    I hereby certify this 5th day of February, 2016, that
14    the foregoing is, to the best of my ability and
15    understanding, a true and correct transcript of the
16    proceedings in the above-entitled matter.
17
18                        S/Deidre D. Juranka, RPR
19                        Official Court Reporter
20
21
22
23
24
25

**Deidre D. Juranka, RPR**
**United States Court Reporter**
**Western District of Louisiana**