IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION


UNITED STATES OF AMERICA       *   Docket No. 2:15-CR-00012
                               *
                               *
VERSUS                         *   February 2, 2016
                               *
                               *
ADLEY LEO DYSON, JR.           *   Lake Charles, Louisiana

*************************************************************

REPORTER'S OFFICIAL TRANSCRIPT OF JURY TRIAL DAY TWO
BEFORE THE HONORABLE PATRICIA MINALDI,
UNITED STATES DISTRICT JUDGE

*************************************************************

**A P P E A R A N C E S**

FOR THE GOVERNMENT: JOHN LUKE WALKER
                    U.S. Attorney's Office
                    800 Lafayette Street, Suite 2200
                    Lafayette, Louisiana 70501
                    Email:  john.walker2@usdoj.gov
                    Phone:  (337) 262-6618
                    Fax:    (337) 262-6682


                    ROBERT F. MOORE
                    U.S. Attorney's Office
                    800 Lafayette Street, Suite 2200
                    Lafayette, LA  70501
                    Email:  robert.moore@usdoj.gov
                    Phone:  (337) 262-6618
                    Fax:    (337) 262-6682


FOR THE DEFENDANT:  CRISTIE GAUTREAUX GIBBENS
                    Federal Public Defender's Office
                    102 Versailles Boulevard, Suite 816
                    Lafayette, Louisiana  70501
                    Email:   cristie_gibbens@fd.org
                    Phone:   (337) 262-6336
                    Fax:     (337) 262-6605


**Deidre D. Juranka, RPR**
**United States Court Reporter**
**Western District of Louisiana**

                              JOSEPH ROUSSEL STREVA, JR.
                              Federal Public Defender's Office
                              102 Versailles Blvd., Suite 816
                              Lafayette, Louisiana  70501
                              Email:  joseph_streva@fd.org
                              Phone:  (337) 262-6336
                              Fax:    (337) 262-6605


REPORTED BY:                  DEIDRE D. JURANKA, RPR
                              611 Broad Street, Suite 267
                              Lake Charles, Louisiana 70601
                              Email:  dd_juranka@lawd.uscourts.gov
                              Phone:  (337) 214-6669
                              Fax:    (337) 437-3873

# I N D E X

PAGE

IN-CAMERA PROCEEDINGS.............................  4

COURT PROCEEDINGS ...............................  8

JEFF HALEY......................................  20

   CROSS-EXAMINATION BY MS. GIBBENS.............  20

   REDIRECT EXAMINATION BY MR. WALKER...........  25

CYNTHIA HAWKINS.................................  29

   DIRECT EXAMINATION BY MR. MOORE..............  29

IN-CAMERA PROCEEDINGS

1

2     MR. WALKER:  This is a problem that was created by

3     myself and Cristie as the officers of this Court.

4     That's where I want to start because we're responsible

5     for this.  And to be honest, I was a state court

6     prosecutor a long time.  I'm used to jury selection and

7     I do all these questions and I didn't do it.  So that's

8     where I start.

9           We didn't ask the jury questions that I think we

10    had to ask them.  I think -- and I'm not saying this

11    isn't fixable, but there are things that we didn't talk

12    to the jury about that I think have to be talked to the

13    jury about.  We didn't ask about -- and it could be that

14    it's on your questionnaire because we got the

15    questionnaire and I didn't -- I went through it quickly

16    as I read it, but I don't think it is.

17          The questions of citizenship, have you lived in the

18    district for over a year, felony convictions.  We did

19    have one guy who, based on his thing, we discovered he

20    had pending felony charges which were stricken for

21    cause.  We didn't do -- and Cristie did this with the

22    second panel but not the first, didn't talk about the

23    defendant's right not to testify and you can't hold it

24    against him.  Reasonable doubt and the fact that the

25    Government has to prove the case beyond a reasonable

**Deidre D. Juranka, RPR**
**United States Court Reporter**
**Western District of Louisiana**

1    doubt and you have to hold them to that and, if they

2    don't prove it, everybody agree to vote not guilty.

3    There's a preliminary instruction read after the jury's

4    picked from the Fifth Circuit pattern, and I don't think

5    it was read.  I know we didn't read the Indictment or

6    the elements of the charge.

7         I think these things can be fixed.  I want to fix

8    them.  I don't want to try this case more than one time.

9    I think this is one of those cases that there's no

10   reason to try it more than one time.  I think it will

11   make all of us insane.  But I think these are

12   significant things that didn't happen, and I think we

13   just have to figure out a way to either fix them now --

14   well, that's -- those are the problems that I saw.

15   Cristie may have additional problems that I haven't

16   said.

17        MS. GIBBENS:  From my standpoint, I feel like I

18   need a mistrial, that I -- you know, very hard to say,

19   but I was ineffective in voir dire yesterday.  They

20   don't my client's presumed innocent.  They don't know

21   that I don't have to prove anything.

22        THE COURT:  And I think I said that.

23        MS. GIBBENS:  I think you might have said the proof

24   things, but I don't think -- and it's me, and I -- I'm

25   worried about the cumulative effect of all of it in

1  trying to fix it now.  And another really problematic

2  thing for me is that included in the instructions they

3  were never told not to talk about the case with each

4  other or with anyone else.

5  THE COURT:  I said that.

6  MS. GIBBENS:  Okay.

7  MR. WALKER:  I didn't hear it either so -- I'm not

8  saying you didn't say it but --

9  THE COURT:  Okay.  All right.  So why don't you

10  people tell me this?

11  MS. GIBBENS:  Exactly.  That's exactly right.  Last

12  night when I realized it and Luke -- Luke and I were on

13  the phone at 9:30 last night realizing everything we did

14  wrong yesterday.  And I do apologize to the Court.

15  MR. WALKER:  It's our fault.

16  MS. GIBBENS:  It is absolutely our fault.

17  THE COURT:  You know, it's so seldom that we have

18  jury trials here, I forget.  Okay.  I forget, but I rely

19  on you to remember.

20  MR. WALKER:  And the other thing is, Judge -- I'll

21  tell you this, and you said this.  You said this to me

22  before we walked in.  You said, "You know what" -- and

23  you were a state court prosecutor just like I was and

24  you said, "I could do voir dire," which meant that it

25  was my obligation to do voir dire and ask all those

1    questions.  And I didn't ask many of the questions I

2    should have asked when you told me that and --

3         MS. GIBBENS:  Same for me.  Absolutely.  You told

4    us right before that we were going to do voir dire, and

5    I dropped the ball.

6         THE COURT:  You know what, we're going back in

7    there, you're going to ask those people those questions

8    and see what answers you get.  And if we need a

9    mistrial, we'll have a mistrial.  But if we don't, we

10   won't.

11        MR. WALKER:  Fair enough.

12        MS. GIBBENS:  What about the instructions not to

13   talk about -- with each other?

14        THE COURT:  Like they do.  Come on.  Really.  I'll

15   do that but --

16        MR. STREVA:  The Fifth Circuit pattern preliminary

17   instructions to them?

18        MS. GIBBENS:  If everything's cured.

19        MR. STREVA:  If everything's cured.

20        THE COURT:  I'm not sure what you mean by that.

21        MS. CAGNEY:  I'll pull it for you.

22        THE COURT:  Let's go back in there and we'll do

23   voir dire times two.

24        MR. WALKER:  Okay.  I don't know what the rule is

25   on reading the Indictment, if I have to read it or not.

1    I don't mind reading it.  I don't mind not reading it.

2    I've never read the Indictment.  I don't think I have

3    to.

4         THE COURT:  Err on the side of caution.

5         MR. WALKER:  I'll read it, then.

6         THE COURT:  Okay.

7                   **COURT PROCEEDINGS**

8              (Call to order of the court.)

9         THE COURT:  Let's come to order, please.  We're

10   bringing the jury back because the parties want to ask

11   some more questions.

12        MR. WALKER:  Thank you very much, Your Honor.

13        THE COURT:  And we're going to determine whether we

14   have a mistrial or we have a jury, and I will take

15   responsibility for this --

16        MR. WALKER:  Respectfully, Your Honor --

17        THE COURT:  -- don't interrupt me; but this will

18   never happen again.  Mr. Walker.

19        MR. WALKER:  Respectfully, Your Honor, it's the

20   parties' responsibility.

21        THE COURT:  Thank you.

22        MS. GIBBENS:  I do agree with that, Your Honor.  I

23   said it in chambers.  I don't know if you want to

24   belabor the point, but I do apologize to the Court.

25        THE COURT:  Thank you.  And, you know, more than

1    anything, I'm sorry for these people's time.

2         Can we come to an agreement about how many jurors

3    we might need to have?  Do we have to have 13?

4         MR. WALKER:  No, we don't have to have 13, Your

5    Honor.  I think we're going to be able to resolve this.

6    I think that we're going to ask the questions and we're

7    going to have positive responses.  I know that we can

8    have less than 12 jurors if there's a circumstance in

9    which we lose two jurors.  I've only known it to go down

10   to 11, although I think it may have gone down to 10.

11        THE COURT:  Ms. Gibbens?

12        MS. GIBBENS:  I would hesitate to agree to a jury

13   of less than 12.

14        THE COURT:  Okay.  I understand.  All right.

15                   (Jury is seated.)

16        THE COURT:  You may be seated.  Thank you.  We have

17   a little strange circumstance here, and the lawyers are

18   going to be asking you a few more questions.

19        MR. WALKER:  And, Your Honor, I believe that I'm

20   going to be actually carrying the bulk of those

21   questions, if not all, in all likelihood.

22        THE COURT:  Okay.

23        MR. WALKER:  I need to ask you questions; and if

24   your answer is no, I want you to raise your hand.  Is

25   everyone on this jury a citizen of the United States of

1        America?

2             THE COURT:  If not, please raise your hand.

3             MR. WALKER:  And there are no hands raised.

4             Has everyone on this jury lived in the Western

5        District of Louisiana?  And that's going to be from

6        Lafayette, Breaux Bridge, all the way to the Texas

7        coast, and then all the way to the top of the State.

8        Everybody lived in the Western District for at least a

9        year?

10            THE COURT:  Please raise your hand if you have not.

11       No hands are raised.

12            MR. WALKER:  Can everybody here read and write the

13       English language?  If not, raise your hand.  No hands.

14            Has anybody been convicted of a felony?  A felony

15       is, in state court, something that's over six months, in

16       federal court it's over a year that you can be in

17       prison.

18            THE COURT:  Imprisonment.

19            MR. WALKER:  Nobody's raised their hand.

20            There are rules in terms of the way -- there are

21       civil cases and there are criminal cases.  In a criminal

22       case we, the United States, have to prove the case

23       beyond a reasonable doubt.  And beyond a reasonable

24       doubt is a really -- it's a heavy burden.  And,

25       essentially, what it says is that the burden of proof is

1    until the end of the case the defendant has no burden.

2    The Government must prove the defendant's guilt beyond a

3    reasonable doubt.  And the Court's going to instruct you

4    what's beyond a reasonable doubt.  Recognize that it's

5    greater than beyond a preponderance of the evidence or

6    probable cause.  It's a heavy burden, and the judge is

7    going to tell you what that burden is at the end of the

8    case.

9         Can everybody on this jury hold us to that burden

10    and if we don't prove our case beyond a reasonable doubt

11    say not guilty?  Can everybody do that?  Please raise

12    your hand if you can do it.  Can everybody do that?

13         THE COURT:  All hands are raised.

14         MR. WALKER:  Thank you.  Another thing in a

15    criminal case, unlike a civil case, the defendant does

16    not have to testify.  In fact, the defendant doesn't

17    have to do anything.  The Defense attorney doesn't have

18    to do an opening statement.  They don't have to put on

19    any witnesses.  The defendant does not have to testify.

20    She can simply sit here and say nothing and do nothing

21    because, again, the burden of proof is on the United

22    States of America beyond a reasonable doubt.

23         Would anybody hold the fact that her client may

24    choose not to testify against her?  If you would hold it

25    against her client, if you would hold it against

1    Mr. Dyson for not testifying, raise your hand.  Okay.
2    Nobody's raised their hand.
3         THE COURT:  No hands are raised.
4         MR. WALKER:  Would anybody hold it against
5    Mr. Dyson or Ms. Gibbens if she chose to say nothing at
6    all?  Because, again, it's a criminal case --
7         THE COURT:  Move on.  Move on, please.  You've
8    already asked that question.
9         MR. WALKER:  Yes, Your Honor.  I'm going to read to
10   you now the Indictment.  Oh.  One other thing.  You
11   have -- as a jury, one of the things that you can't do
12   is talk about this case with each other at all.  You
13   can't say -- you can't talk to each other about it yet.
14   You can't talk to other people outside of the courthouse
15   about it.  You can't talk to your family about it or
16   anybody else until you get to talk to each other at the
17   very end of the case when you begin deliberating because
18   you haven't heard all the evidence in the case.  So
19   until you hear all the evidence, you can't make a
20   decision whether the person's -- whether we've proved
21   our case or not.
22        Will everybody agree not to speak to anybody else
23   and, also, not to speak to each other about what's going
24   on in the courtroom until the conclusion of the case
25   when y'all begin deliberating?

1    THE COURT:  If you can't agree to that, please

2    raise your hand.  No hands are raised.

3    MR. WALKER:  The final thing I'd like to do is read

4    the Indictment that has been levied in this case.  It

5    says "United States versus Adley Leo Dyson, Jr.

6    Indictment.  The federal grand jury charges that all

7    times material to the Indictment the defendant, Adley

8    Leo Dyson, Jr., was a resident of the Western District

9    of Louisiana owning the property located at 147 John

10   Street, Cameron, Louisiana.  On about November 25th of

11   2003 the residence located at 147 John Street, Cameron,

12   Louisiana was destroyed by fire.  The Jefferson Davis

13   Electric Company disconnected all electricity to the

14   property on the same date.

15   On May 18, 2004 the Cameron Parish Police Jury sent

16   a letter to the defendant, Adley Leo Dyson, Jr.,

17   advising him that the structure of the property had to

18   be demolished and removed from the property because it

19   was uninhabitable as a result of the fire."

20   THE COURT:  Wait.  I'm sorry.  The structure of the

21   property or the destruction of the property?

22   MR. WALKER:  The structure had to be demolished.

23   "...the structure on the property had to be demolished

24   and removed from the property because it was

25   uninhabitable as a result of the fire.

1        On September 24, 2005 Hurricane Rita came onshore

2   in southwest Louisiana.  The United States Department of

3   Housing and Urban Development provided funds from the

4   Louisiana Road Home Program for the purpose of aiding

5   the residents whose homes were damaged in the natural

6   disasters, including Hurricane Rita.  In order to be

7   eligible to receive funds from the Louisiana Road Home

8   Program, the applicant had to own a home or condominium,

9   that home or condominium had to be the applicant's

10   primary residence, and the home had to have been damaged

11   either in Hurricane Katrina or Rita.

12        Scheme to Defraud, Count 1.  On an unknown date but

13   reasonably near September 25th, 2005 and continuing

14   until March 17th, 2010 in the Western District of

15   Louisiana and elsewhere, the defendant, Adley Leo Dyson,

16   Jr., did knowingly and intentionally create a scheme to

17   defraud and to obtain money and property by means of

18   false and fraudulent pretenses, representations and

19   promises as set forth fully herein.

20        On July 3rd, 2007, Adley Leo Dyson, Jr. submitted

21   an application to the Louisiana Road Home Program

22   fraudulently claiming that his home located at 147 was

23   his primary residence at the time of the hurricane and

24   it was damaged or destroyed as a result of Hurricane

25   Rita.

**Deidre D. Juranka, RPR**
**United States Court Reporter**
**Western District of Louisiana**

1    On December 18, 2007, the defendant, Adley Leo

2    Dyson, Jr., signed a Louisiana Road Home Program benefit

3    selection form for a total benefit of $118,150,000.

4    On January 3rd, 2007, as a result of the

5    application described above, HGI Catastrophic Services,

6    LLC wired funds in the amount of $88,080 to Capital One

7    Bank Account No. xxx1519 located in Cameron, Louisiana,

8    belonging to Adley Leo Dyson Jr.

9    On August 11th of 2008, as a result of the

10   application described above, HGI Catastrophic Services,

11   LLC wired funds in the amount of $30,000 to Capital One

12   Bank Account No. xxx2111 located in Cameron, Louisiana,

13   belonging to Adley Leo Dyson Jr.

14   On November 6, 2009 the State of Louisiana, Office

15   of Community Development sent the defendant, Adley Leo

16   Dyson, Jr., a letter advising him that LRHP fund cap per

17   applicant had been raised and he might be eligible for

18   an additional $31,850 in compensation grant funds.  In

19   order to be eligible, the applicant had to have been

20   entitled to funds from the Louisiana Road Home in his

21   original application.

22   On November 9, 2009 the defendant, Adley Leo Dyson,

23   completed the Louisiana Road Home additional

24   compensation grant payment fund in the amount of $31,850

25   and returned it to the Louisiana Road Home Program.

1        On about March 3rd, 2010, in the Western District

2    of Louisiana and elsewhere, the defendant, Adley Leo

3    Dyson, Jr., having devised the above described scheme

4    and artifice to defraud and to obtain money through

5    false and fraudulent pretenses, representations and

6    promises and for the purpose of executing and attempting

7    to execute the scheme, did knowingly cause to be

8    transmitted by means of wire communication and

9    interstate commerce certain signals, signs, sounds and

10   writings, that is a wire transfer in the amount of

11   $31,850 from HGI Catastrophic Services, LLC through the

12   Independent Bankers Bank located in Irving, Texas, to

13   Capital One Bank located Richmond, Virginia, and

14   thereafter to Capital One Bank Account No. 111 located

15   in Cameron, Louisiana belonging to Adley Leo Dyson, Jr.,

16   all in violation of Title 18 United States Code

17   Section 1343."

18        THE COURT:  Would the Defense like to make a

19   statement?

20        MS. GIBBENS:  I have two questions, Your Honor,

21   very briefly.

22        THE COURT:  Okay.

23        MS. GIBBENS:  Under our laws, Mr. Dyson is presumed

24   innocent.  Mr. Walker just read the Indictment, and

25   Mr. Dyson is still presumed innocent.  Would you please

1     raise your hand if you feel that because the Government

2     has indicted Mr. Dyson then he must be guilty.

3          THE COURT:  Please raise your hand if you feel that

4     way.  No hands are raised.

5          MS. GIBBENS:  And would you also now consider and

6     raise your hand if you feel like, after hearing that

7     Indictment, if Mr. Dyson was truly innocent he would

8     take the stand and defend himself.

9          THE COURT:  If you feel that way, please raise your

10    hand.  No hands are raised.

11         MS. GIBBENS:  That's it, Your Honor.  Thank you.

12         THE COURT:  Thank you.

13         MR. WALKER:  Thank you, Your Honor.

14         THE COURT:  Call your next witness.

15         MR. WALKER:  Your Honor, the witness is currently

16    under cross-examination.  I'll leave and go get him

17    right now.

18         THE COURT:  Correct.

19         MS. GIBBENS:  Oh.  Are we going to read the

20    preliminary instructions?

21         MR. WALKER:  If you'd like, Your Honor, the Court

22    could read the preliminary instructions while I get the

23    witness so he's ready to go.

24         MS. GIBBENS:  Whatever.

25         THE COURT:  Could I have those, please.

1    MR. STREVA:  I'm sorry.  Yes, Your Honor.

2    THE COURT:  Thank you.  Okay.  I've never had to do

3    this before, but I will do it because you asked me to.

4    Now that you have been sworn, I will give you some

5    preliminary instructions to guide you in your

6    participation in this trial.  It will be your duty to

7    find from the evidence what the facts are.  You and you

8    alone will be the judges of the facts.  You will then

9    have to apply to those facts the law as I give it to

10   you.  You must follow that law whether you agree with it

11   or not.  Nothing the Court may say or do during the

12   course of this trial is intended to indicate or should

13   be taken as indicating what your verdict should be.  The

14   evidence --

15                 (Witness enters courtroom.)

16   THE COURT:  You can have a seat.  You can have a

17   seat right now.  Okay.

18   The evidence from which you will find the facts

19   will consist of the testimony of witnesses, documents

20   and other items received into the record as exhibits,

21   and any facts that the lawyers agree to or stipulate,

22   which means agree to, that I may instruct you to find.

23   Certain things are not evidence and must not be

24   considered by you.  I will list them for you now.

25   Statements, arguments, and questions by the lawyers

1    are not evidence.

2         Objections to questions are not evidence.  Lawyers

3    have an obligation to their clients to make objections

4    when they believe evidence being offered is improper

5    under the rules of evidence.  You should not be

6    influenced by the objection or by the Court's ruling on

7    it.  If the objection's sustained, ignore the question.

8    If it is overruled, treat the answer like any other.

9         If you are instructed that some item of evidence is

10   received for a limited purpose only, you must follow

11   that instruction.

12        Testimony that the Court has excluded or told you

13   to disregard is not evidence and must not be considered.

14        Anything you may have seen -- really?  Do we have

15   to go through all this?  Is there more that you want me

16   to say?

17        MR. WALKER:  I'm satisfied.

18        MS. GIBBENS:  Okay.  We're satisfied, Your Honor.

19   Thank you.

20        THE COURT:  Okay.  Thank you.  Call your witness.

21   Sir, come forward.  You're still under oath.

22        MS. GIBBENS:  Thank you, Judge.  Mr. Haley, I'm

23   almost done.  Sorry about you having to come back again

24   today.

25        THE COURT:  You know, really?  Why do you have to

1        apologize to him?

2              MS. GIBBENS:  Okay.

3              THE COURT:  You don't.  Okay.

4              MS. GIBBENS:  Okay.

5                        **JEFF HALEY**,

6    after being first duly cautioned and sworn to tell the truth,

7    the whole truth and nothing but the truth, did testify on

8    oath as follows:

9                        **CROSS-EXAMINATION**

10   BY MS. GIBBENS:

11       Q.   As I remember your testimony yesterday, when we

12   left off we were talking about Exhibit 11.  And we're not

13   going to go over it again.  I just want you to remember what

14   it looked like.  It was this one, the elevation incentive

15   form where it asked what type of structure was damaged in the

16   storm and Mr. Dyson said a mobile home.  And we were talking

17   about that yesterday and you had testified that Mr. Dyson had

18   misunderstood the form.  And, in fact, yesterday you also

19   testified that the elevation grant for mobile homes was less

20   than what the elevation grant for single houses was, correct?

21       A.   That is correct.

22       Q.   It was 20,000 for mobile homes, 30,000 for houses?

23       A.   Yes.

24       Q.   But Mr. Dyson received the 30,000 even though he

25   checked off the mobile home on the form, correct?

1     **A.**   That is correct.

2     **Q.**   And moving to 2009 when the State of Louisiana sent

3  the additional compensation grant letter to Mr. Dyson.  That

4  letter says that Mr. -- that the Road Home people had

5  reviewed his file, correct?  It says "Your file has been

6  reviewed"?

7     **A.**   Yes.

8     **Q.**   And based on that review, they determined he could

9  receive more funds, right?

10    **A.**   Yes.  It was an electronic review reporting that.

11    **Q.**   And yesterday Mr. Walker asked you about this

12  document which is Exhibit 15.  It's the second page of the

13  additional compensation grant payment acceptance form where

14  it says Mr. Dyson gave instructions for wiring the funds to

15  Road Home?

16    **A.**   Yes.

17    **Q.**   Okay.  And at the bottom this says "Capital One,

18  confidential," right?

19    **A.**   Yes.

20    **Q.**   This came from Capital One?

21    **A.**   Yes.  Homeowners are required to get that from

22  their bank and turn in with the form.

23    **Q.**   He didn't type out that form, though?

24    **A.**   No.

25    **Q.**   And yesterday when you -- Mr. Walker had you read a

1    part of Exhibit 6, which was the home applicant

2    certification, and in there it said that, among other things,

3    Road Home had the option to sue Mr. Dyson civilly for

4    reimbursement, right?

5        **A.**    Correct.

6        **Q.**    When you were talking about closings, like there

7    are closings and those sorts of things in these files, are

8    those in person?

9        **A.**    The initial closing.  I testified yesterday the

10   initial closing is.  They come in.  They did a group type

11   closing where they get instructions.  And then they would sit

12   down with an attorney to go through the documents and have

13   them notarized.  The additional closings are what we call

14   mail away closings.

15            THE COURT:  You know, almost nobody knows what a

16       closing is accept us.

17   BY MS. GIBBENS:

18       **Q.**    Okay.  When we're talking about closings we're

19   talking about how a -- the final -- well, why don't you tell

20   us what a closing is instead of me trying to explain it.

21            THE COURT:  You can lead.  He's on

22       cross-examination.

23   BY MS. GIBBENS:

24       **Q.**    Okay.  So a closing -- when we're talking about

25   closings in the Road Home context, this is after the file has

1     been reviewed.  In the first closing, the parties would be

2     there and all of the final documents would be signed for the

3     transfer of the money?

4          A.    Correct.  In the Road Home context, it's not

5     transfer of property.  It's -- unless it's an option two or

6     three.  In option one, it's where the agreements are signed,

7     the covenants that are recorded on the property, the

8     certification agreements, all of the documents.  It has

9     normal -- in most cases, normal documents like a closing if

10    we were buying a house; but it is different.  It's unique to

11    the Road Home; but it's to get all the information signed,

12    notarized before the funds are disbursed.

13              THE COURT:  Take a recess.  10 minutes.  Like to

14         see the attorneys in chambers.

15                        (Recess is taken.)

16              THE COURT:  Whenever the jury is ready.  They can

17         come out.

18              MR. WALKER:  Yes, Your Honor.

19              THE COURT:  Whenever they're ready.

20                        (Jury is seated.)

21              THE COURT:  Everyone can be seated.  Ms. Gibbens,

22         you may continue.

23              MS. GIBBENS:  Thank you, Judge.

24    BY MS. GIBBENS:

25         Q.    You testified on direct yesterday when Mr. Walker

1    was questioning you that there were a lot of quality control

2    measures before final approval in closings.  You said there

3    were, like, a lot of checks and balances, at least five

4    different levels of people looking at each file before there

5    was a closing, correct?

6        A.   Correct.

7        Q.   And at each level when this file was reviewed it

8    contained the tax assessment from 2005 showing that there was

9    no homestead exemption, correct?

10       A.   Yes.

11       Q.   Which means no proof of occupancy on that basis,

12   right?

13       A.   Not based on the homestead exemption.

14       Q.   And then, also at each level, had the letter from

15   the electric company saying this house didn't have

16   electricity at the time of Rita, right?

17       A.   Yes.

18       Q.   And that also is a lack of proof of occupancy,

19   right?

20       A.   Yes.

21           MS. GIBBENS:  One second, Your Honor.  Thanks.  No

22       further questions.

23           THE COURT:  Thank you.  Redirect?

24           MR. WALKER:  Very brief.

25           THE COURT:  Let's hope so.

                    REDIRECT EXAMINATION
1  
2  BY MR. WALKER:
3       Q.   The Defense asked you about the document that
4  Mr. Dyson signed, and she said that document says that he is
5  subject to civil penalties.  In other words, the State can
6  sue him if he gets money he's not entitled to.
7       A.   Correct.
8       Q.   Does it also say that if he makes misstatements on
9  the document that he can be prosecuted criminally?
10      A.   Yes.
11           MR. WALKER:  This next question, the last question,
12      is simple but it may resolve an issue with a witness.
13      So it goes just barely beyond the scope of cross, and
14      I'm asking it to speed the process along.
15           THE COURT:  Go ahead.
16  BY MR. WALKER:
17      Q.   You testified previously that the inspector was
18  taught and required to take a picture of the occupant of a
19  home when they went to do the inspection if that person was
20  there.
21      A.   Yes.
22      Q.   In the inspection of Adley Dyson's home was there a
23  picture of him?
24      A.   No.
25      Q.   Was there a picture of the property?

1      A.   Yes.

2      Q.   So, based on the requirements of the Road Home

3   Program, he was not there when the inspector did the

4   inspection?

5      A.   Correct, based on the picture.

6           MR. WALKER:  That's all I have.

7           THE COURT:  Thank you.  You may step down.  Call

8   your next witness.

9           MR. WALKER:  Your Honor, I have two stipulations.

10          THE COURT:  Okay.

11          MR. WALKER:  Oh.  I would ask this witness be

12   released from his subpoena so he can go back to work.

13          THE COURT:  Any objection?

14          MS. GIBBENS:  No, Your Honor.

15          THE COURT:  Okay.  You are relieved and released.

16          MR. WALKER:  Your Honor, if John Mike Gaskins were

17   called to testify, he works for a company whose job it

18   was to pay the money people received from the Road Home

19   grants.  He would testify that when a person received

20   money, like Mr. Dyson, from the Road Home grant a bank

21   in Texas would wire the money to the person's bank

22   account.  That would be -- and the bank in Texas that

23   wires the money is Business First Bank, an Independent

24   Bankers Bank.  And, actually, Independent Bankers Bank

25   is the bank that actually wires the money to the

1       person's account.  In this case, it was Mr. Dyson's

2       Capital One account.

3           THE COURT:  Thank you.  Is that the stipulation?

4           MS. GIBBENS:  Yes, Your Honor.

5           THE COURT:  Okay.  This is a rare circumstance when

6       both parties agree on something.  So the Defense and the

7       Government are agreeing that this is a fact.  So they're

8       not calling a witness because they're agreeing that this

9       is a fact.

10          MR. WALKER:  And there's a second stipulation.

11          THE COURT:  Go ahead.

12          MR. WALKER:  This is a signed stipulation which

13       says when the Independent Bankers Bank sends a wire

14       transfer to a customer's bank account at Capital One

15       Bank the wire travels from Texas to Richmond, Virginia

16       and then back to the Capital One Bank account associated

17       with receiving the funds.  Because of that, the wires

18       travel from one state to another which is in interstate

19       commerce.

20          MS. GIBBENS:  That's correct, Your Honor.

21          THE COURT:  Stipulated?

22          MS. GIBBENS:  Yes, Your Honor.

23          THE COURT:  Once again, the parties are agreeing.

24       You know, interstate commerce is a term of law and art

25       which means from one state to another; but that could

1        happen by computer, by internet, by all sorts of ways

2        these days which constitutes interstate commerce.

3              And which one are we talking about here,

4        Mr. Walker?

5              MR. WALKER:  Your Honor, in this case we're talking

6        about the money that was actually sent.  Money was sent

7        three times to Mr. Dyson.  It was wired to his Capital

8        One account.

9              MS. GIBBENS:  Your Honor, at this point --

10             THE COURT:  No stipulation?

11             MS. GIBBENS:  It's a stipulation, but this is going

12       into testimony of Mr. Walker.

13             MR. WALKER:  And I understand.

14             THE COURT:  Well, I'm not so sure about that

15       because, you know, it's one or the other.

16             MS. GIBBENS:  The beginning of his statement was

17       answering a question and it was just going on to explain

18       the evidence that he thinks is going to come out and

19       stuff like that.  That was the basis of my objection.

20             THE COURT:  All right.

21             MR. WALKER:  I'm totally good with that based on

22       the documents that have been submitted.

23             THE COURT:  All right.

24             MR. MOORE:  Your Honor, at this time the Government

25       calls Cynthia Hawkins to the witness stand.

1          THE COURT:  Ms. Hawkins please come forward to the

2     podium.

3                         CYNTHIA HAWKINS,

4     after being first duly cautioned and sworn to tell the truth,

5     the whole truth and nothing but the truth, did testify on

6     oath as follows:

7                         DIRECT EXAMINATION

8     BY MR. MOORE:

9          Q.   Good afternoon, Ms. Hawkins.

10         A.   Hello.

11         Q.   If you could just introduce yourself to the ladies

12    and gentlemen of the jury one more time.

13         A.   My name is Cynthia Hawkins.

14              THE COURT:  Speak up, please.  You can adjust that

15         microphone and your chair.  We need to hear you.

16         A.   My name is Cynthia Hawkins.

17    BY MR. MOORE:

18         Q.   And where are you from, Ms. Hawkins?

19         A.   Lake Charles.

20         Q.   And have you lived there most of your life?

21         A.   Yes, I have.

22         Q.   And what do you do for a living?

23         A.   I'm a quality analyst at Northrop Grumman.

24              THE COURT:  I'm sorry.  Say that again.

25              THE WITNESS:  Quality analyst.

1            THE COURT:  At Northrop?

2            THE WITNESS:  Grumman.

3            THE COURT:  Okay.  Thanks.

4     BY MR. MOORE:

5        Q.   And how long have you worked at Northrop Grumman?

6        A.   Six years.

7        Q.   And prior to working at Northrop Grumman did you

8     work somewhere else?

9        A.   Yes.  I worked at Northrop Grumman before.  I was

10    laid off.  I went to work at the employment office.  Then I

11    went to Road Home for two years, back to the employment

12    office, and then I was rehired at Northrop Grumman where I am

13    now.

14       Q.   You heard about this great opportunity at the Road

15    Home Program so you decided to work there for a little while?

16       A.   Yes.  It was a temporary job at the employment

17    office so I applied at Road Home because it was more money.

18       Q.   And if you could tell the ladies and gentlemen of

19    the jury, when exactly did you start at the Road Home

20    Program?

21       A.   June of 2006.

22       Q.   And what position did you apply for and obtain at

23    Road Home?

24       A.   I applied for a housing adviser position, and

25    that's what I took.

1      **Q.**   And did you have to go through an interview and
2  everything for that?
3      **A.**   Yeah.  I interviewed at the employment office with
4  the Road Home personnel, and then I brought my resume and I
5  was hired.
6      **Q.**   After you interviewed and prior to actually
7  starting to take applications from people, was there some
8  type of training process that you --
9      **A.**   Yes.  We had some training classes at the Isle of
10  Capri for a few days, told us how to interview the people,
11  gave us a script so we'd know what kind of questions to ask.
12      **Q.**   And just explain that a little bit more to the
13  ladies and gentlemen of the jury.  I mean, did you guys do
14  mock interviews?  Like, what type of things --
15      **A.**   Yes.
16      **Q.**   -- did you do during the training process?
17          THE COURT:  Wait, wait, wait.  Slow down.
18          MR. MOORE:  All right.  Trying to move as fast as
19      possible.
20      **A.**   Yes.  We -- they took us in groups and we took
21  turns -- you know, like, one person would pretend to be a
22  housing adviser, another person would be the applicant, and
23  we could ask questions back and forth.  That way we'd get
24  used to interviewing the person.
25  BY MR. MOORE:

1      Q.   And do you remember how long the program lasted?

2      A.   The training program?

3      Q.   Yeah.

4      A.   About a week.

5      Q.   And then after the week long training program you

6   began to take actual applications?

7      A.   Yes, we did.

8      Q.   Do you remember when that was?  Was that June

9   of 2006 also?

10      A.   Right.

11      Q.   Now, explain to the ladies and gentlemen of the

12   jury what the application process entails.

13      A.   You could have either gone on-line and applied for

14   a grant or you could have come into the office and applied.

15   A lot of people did on-line.  If you didn't, you made an

16   appointment, came up to the Road Home office, and you were

17   seen by a housing adviser.

18      Q.   So either way, if you filled out on-line or if you

19   came up to the program and filled it out at the location, you

20   had to sit down with the housing adviser and go over the

21   form?

22      A.   Correct.

23      Q.   Now, tell the ladies and gentlemen of the jury

24   what -- how you went over the application with the people.

25      A.   Okay.  I would go up front and get the applicant,

1    bring them back to the office.  We would give them printed

2    materials about the Road Home Program.  We would give them an

3    overview of the program, discuss the different kinds of

4    grants that were available.  We would tell them about the

5    options that they had and then take their occupancy documents

6    or any other kind of documentation they brought to the

7    interview.

8        Q.    Now, had they filled out the application on the

9    internet, would you go through page by page their responses

10   to the questions that they'd brought to you?

11       A.    Yes.  We pulled the application up on the computer

12   and went through all the questions.

13       Q.    And when you went through every page, did you have

14   them initial to say that you had gone over that page with

15   them?

16       A.    Afterwards, we'd print out the application.  We'd

17   review it with them and have them sign or initial each page.

18       Q.    Are there portions of the application that allow

19   and/or require you to actually input some of the stuff

20   yourself?

21       A.    Yes.  In the comments section we had to put notes.

22       Q.    Now, briefly, I want to cover are there any rules

23   with regards to the -- how you guys are given the

24   applications.  For example, are you allowed to review an

25   application for somebody that you might know personally?

1     **A.**   No, we couldn't interview somebody -- if we went up

2   front and we knew that person, we would have to hand them off

3   to another housing adviser.

4     **Q.**   Are you guys incentivized?  By that I mean do you

5   guys get paid per application that you do per day?

6     **A.**   No.  We had a flat salary.  Everybody made the

7   same.  It didn't matter how many applications you did.

8     **Q.**   And what about based on the amount of money that

9   you guys were giving out; did you get a bonus for allowing

10   people to get more money?

11     **A.**   No, there were no bonuses.

12     **Q.**   And so when the people show up at the office how

13   are they, I guess, assigned to you guys?

14          THE COURT:  How are they what?

15   BY MR. MOORE:

16     **Q.**   Assigned to an actual adviser, housing adviser like

17   yourself.

18     **A.**   Well, whoever didn't have an applicant, they would

19   come and say, "Do you have anybody?"  If they said no then

20   they said, "Okay.  Come up front and you can take this

21   person."

22     **Q.**   And were you, I guess, permanently linked to that

23   case, meaning if there was any followup phone calls, did it

24   automatically have to be you that --

25     **A.**   No, not necessarily.

1          THE COURT:  Try not to speak over each other.  She

2      has to take down every word that you say, Ms. DD, so if

3      you talk over each other it's hard.

4  BY MR. MOORE:

5      Q.   Now I want to move to August of 2007.  Were you

6  working at Road Home specifically on August 10, 2007?

7      A.   Yes, I was.

8      Q.   An August 10, 2007 did you go over an application

9  with a Mr. Adley Dyson, Jr.?

10     A.   Yes, I did.

11     Q.   Now, do you remember that independently or you just

12  remember --

13     A.   No, I don't remember him.  I just --

14          THE COURT:  We're doing it again.

15  BY MR. MOORE:

16     Q.   Let me get out the full question.  The full

17  question is:  Do you remember that independently or do you

18  remember that because you've been subpoenaed here to testify

19  in this trial and had to go over the documents?

20     A.   I don't remember him.  I saw my name on the

21  application as a housing adviser.

22     Q.   And on August 10th of 2007, correct me if I'm

23  wrong, but you'd have been working at Road Home at that point

24  for about a year?

25     A.   Yes, I had.

1      **Q.**   So you had done a number of applications by this
2  point?
3      **A.**   Yes, I had.
4      **Q.**   Now, prior to coming to testify today, have you had
5  the opportunity to review Mr. Adley Dyson, Jr.'s application?
6      **A.**   Yes, I did.
7      **Q.**   And just one other question about the way the
8  process worked.  Did you guys have supervisors at the Road
9  Home?
10      **A.**   Yes.  We were broken up into teams and each team
11  had a team leader.
12      **Q.**   Would team leaders at times come into your actual
13  advisory meetings with the applicants and watch you guys go
14  over the applications with them?
15      **A.**   Sometimes they did just to make sure everything was
16  running right, see if we needed anything or if the applicant
17  had any questions.
18      **Q.**   And did you know when they were going to be coming
19  into the room?
20      **A.**   No.  They just popped in.
21      **Q.**   Now I want to turn your attention to the actual
22  documents.  And for the record, it will be Government's
23  Exhibit 2, the second page of Government's Exhibit 2.  If you
24  could tell the ladies and gentlemen of the jury -- we're
25  going to blow it up in a second.  If you could tell them what

1     document this is.

2          A.    This is a tracking sheet.  Whenever an applicant

3     would come they would write down what time they got there.

4          Q.    So we're going to blow up the top portion of this

5     document.  And what do you see here reflected on the top

6     portion?

7          A.    I see the applicants name, the applicant I.D. and

8     the date.  And it shows you that it's an initial advisory

9     session and it's a preclosing session, which means he hasn't

10    closed on his application yet.

11         Q.    And does it reflect the time he arrived?

12         A.    Yes.  He got there at 12:00 noon.

13         Q.    Was that the scheduled appointment?

14         A.    Oh.  That was the scheduled appointment.  He got

15    there at 11:31 and the scheduled appointment was at 12:00.

16         Q.    And does it show who the adviser is?

17         A.    Yes.  My name is at assigned adviser, Cynthia H.

18         Q.    So that was how you were able to recognize this

19    application?

20         A.    Yes.

21         Q.    Now, moving to Page 3 of Government's Exhibit 2.

22    What is this document?

23         A.    This is the initial advisory meeting checklist to

24    ensure that we went through all of the items listed.

25         Q.    And so just for the ladies and gentlemen of the

1    jury, would this be a document that is a checklist so that
2    you know that you've gone over these things with the
3    applicant?
4         A.   Correct.
5         Q.   So everything that's checked reflects something
6    that you personally went over with him?
7         A.   Yes, sir.
8         Q.   So, for example, when it says elevation grant plus
9    30,000, does that mean you explained to him that he was
10   entitled to that and why he was entitled to that?
11        A.   Yes.
12        Q.   And where it says the program eligibility
13   requirements, does that mean that the eligibility
14   requirements were explained to him by you?
15        A.   Yes.
16        Q.   And had you not explained that to him would you
17   have checked yes?
18        A.   No.
19        Q.   Now going to -- just go to the bottom of this
20   document.  Whose signatures are reflected at the bottom of
21   the document?
22        A.   My signature as the adviser and then the
23   applicant's signature.
24        Q.   And so he would have actually signed the document
25   himself?

1      A.   Yes.

2      Q.   And at this point he's certifying that you've

3  explained to him what the program eligibility requirements

4  are?

5      A.   Yes.

6      Q.   And he's also certifying that you've explained to

7  him what an elevation grant is and why he would be entitled

8  to it?

9      A.   Correct.

10     Q.   If we could move to Page 4 of Government's

11  Exhibit 2, what is this page?

12     A.   This is the sheet that we would fill out at the end

13  so we would know what documents he brought in and what other

14  documents he still needed.

15     Q.   If we could just zoom into what those documents

16  were.  And so all these documents, the FEMA documents, the

17  photo I.D., picture of the applicant, that's all things that

18  he brought to you?

19         THE COURT:   Correct?

20  BY MR. MOORE:

21     Q.   The ones that are checked.

22     A.   The ones that are checked.

23     Q.   And the ones -- it's kind of hard to read, but the

24  rest of those N.A.'s are documents that he didn't have?

25     A.   N.A. means that those weren't relevant.  If it's an

```
 1    A.X. it means that we needed them but he didn't bring them
 2    in.
 3         Q.   So, for example --
 4              THE COURT:  Wait.  What is A.X.?  Where is that?
 5              THE WITNESS:  If you go up.
 6              THE COURT:  Okay.  The first two?
 7              THE WITNESS:  Yes, ma'am.
 8              THE COURT:  Okay.
 9    BY MR. MOORE:
10         Q.   So occupancy documents were something that you
11    still needed from him at that time?
12         A.   Right.
13         Q.   So, basically, he's telling you that he lived there
14    but he needs to show you that he lived there with an
15    occupancy document?
16         A.   Yes.
17         Q.   What about for ownership documents on the bottom
18    left corner?
19         A.   He didn't have them.
20              THE COURT:  He didn't have what?
21              THE WITNESS:  Ownership documents.
22    BY MR. MOORE:
23         Q.   Now I'm going to move to I believe the fifth page
24    of Government's Exhibit 2 which starts the first page of a
25    seven page document.  What is this document?
```

1      **A.**   This is the actual application.

2      **Q.**   So this is what he would have filled out on the

3  internet?

4      **A.**   Correct.

5      **Q.**   And this is what you would have gone over page by

6  page with him?

7      **A.**   Yes.

8      **Q.**   If you could blow up the top portion of that.  What

9  is the jury looking at here?

10     **A.**   This is the actual Road Home application after it's

11  printed out from the computer.

12          THE COURT:  It needs to be blown up more than that.

13  BY MR. MOORE:

14     **Q.**   If we could just blow up the bottom portion.  Okay.

15  So here he's giving you the address that he's claiming that

16  he lived at at the time of the hurricane?

17     **A.**   Yes.

18     **Q.**   And what is that reflected in the corner that's

19  handwritten?

20     **A.**   That's his initials.

21     **Q.**   So that means that on that date he's telling you,

22  "At the time of the hurricane I lived here," and then he's

23  initialling that page?

24     **A.**   Correct.

25     **Q.**   Now, if we could move to the second page of this

1   document, the top portion.  In the top portion of this

2   document, what is he required to give you here?

3       A.   This is e-mail contact information and his

4   telephone numbers.

5       Q.   And that's just in case there's more information

6   that you guys need to get from him?

7       A.   Yes.

8       Q.   And kind of the same thing with the middle portion,

9   this portion?

10      A.   Yeah.  We asked him to give us a name of a relative

11  or friend in case we couldn't get in contact with him

12  specifically; we could call these people and track him down.

13              THE COURT:  I'm sorry.  Can you say that again.

14              THE WITNESS:  We would always ask the applicant to

15         give us the name of a relative or friend in case we

16         can't get in contact with them; we can call these

17         persons.

18              THE COURT:  Thank you.

19  BY MR. MOORE:

20      Q.   Now to the bottom portion of Page 2 of this

21  document.  If you could, explain to the ladies and gentlemen

22  of the jury what these three questions reflect.

23      A.   The first question asked was it a single home or a

24  double unit or condominium, and he stated yes.

25      Q.   And so that basically just means that one of the

1  requirements is that it had to be one of these two, and he's

2  saying that it was?

3      **A.**   Yes.

4      **Q.**   And then the next question?

5      **A.**   "Was your home damaged or destroyed by Hurricane

6  Katrina or Rita?"  So we were asking was the house damaged at

7  all because of these hurricanes, and he said yes.

8      **Q.**   Now, at the time that you guys went over this, was

9  there ever any conversation that you recall about the house

10 being damaged prior to the hurricane?

11     **A.**   Not that I recall, no.

12     **Q.**   Do you recall any conversation with any applicant

13 about their house having burned down or burned substantially

14 where it needed to be torn down prior to the hurricane?

15     **A.**   No.  I mean -- no.

16     **Q.**   Had somebody told you that, how would you have

17 reacted to that given the answer to this question?

18     **A.**   I would have said that they probably weren't

19 eligible because you had to have been living in the home at

20 the time of the storm.

21     **Q.**   So, to your recollection, when this question was

22 answered and gone over, when you went over this question with

23 the defendant, he did not inform you that his home had been

24 damaged prior to the hurricane?

25     **A.**   No, he had not.

1      Q.    Now, the third question, what is that question?

2      A.    It's asking if the hurricane affected your

3  property, did you own the home on the date of the storm.  And

4  those are the two dates of Hurricanes Katrina and Rita.  And

5  he said yes, he was living -- he owned the home at the date

6  of the storm.

7      Q.    And at that time you didn't have -- did you have a

8  deed in your possession?

9      A.    No, I did not.

10      Q.    So you were kind of, on some level, relying on him,

11  his response --

12      A.    Right.

13      Q.    -- when he says yes?

14      A.    Correct.

15      Q.    And later -- we'll get to that portion later.

16  We'll go to Page 3, the top of Page 3.  Blow up the first

17  couple of questions at the top of Page 3.  The first

18  question -- what is the first question?

19      A.    It asks if the home was the primary residence at

20  the date of the storm, and his answer was yes.

21      Q.    And primary residence is defined as the house where

22  he was living?

23      A.    Yes.  You had to be living in the home, that was

24  your main home.

25      Q.    If somebody told you that their house had been

1    damaged prior to the storm and they were staying somewhere

2    else but they wanted to get back to their house, how would

3    you have responded to them answering yes to that question?

4        A.   They had to have been living in the house on the

5    date of the storm.

6        Q.   So, to your recollection, did anyone ever tell you

7    that they weren't living in the house on the date of the

8    storm but had answered yes to this question?

9        A.   No.

10       Q.   What would you have done had they done that?

11       A.   I would have said they weren't eligible for the

12   program.

13           THE COURT:  Let's take a 10 minute recess.  Thank

14       you.

15                     (Recess is taken.)

16           THE COURT:  You may be seated.  All right.  You may

17       continue.

18           MR. MOORE:  For the record, I believe we were on

19       Government's Exhibit 2 and we were on Page 3 of the --

20           THE COURT:  You'll need to speak up.

21   BY MR. MOORE:

22       Q.   For the record, I believe we were on Page 3 of the

23   seven page document within Government's Exhibit 7.  And I

24   think we left off on the top of Page 3, blowing up those

25   first two questions.  I think we had just talked about the

1    fist question.  If you could, again, explain what that first
2    question was.
3        A.   Verifying that the house was the primary residence
4    of the applicant.  He said yes.
5        Q.   And that means he's telling you that he lived there
6    at the time of the storm?
7        A.   Correct.
8        Q.   And had he told you that he did not, in fact, live
9    there, was trying to get back into the house for some reason,
10   what would you have done?
11       A.   I would have said he was ineligible.
12       Q.   Now, to be clear to the jury, is it your job to
13   determine eligibility?
14       A.   No.  The program has its own definitions of
15   eligibility and that's what we went by.
16       Q.   But if somebody tells you something, some extra
17   details, for example, that can't be answered through a
18   drop-down box, how would you reflect that in the application?
19            THE COURT:  What does that mean, a drop-down box?
20   BY MR. MOORE:
21       Q.   The yeses that we see, how are those answers put
22   there?
23       A.   There's a box and you would click yes or no.
24       Q.   That's if you're doing it over the internet?
25       A.   Right.

1    **Q.**    Even if they come in, is it still pulled up on the
2    internet?
3    **A.**    Yes, when I do on the computer, it did.
4    **Q.**    And so even if they did the application by hand,
5    when they'd come in to you is everything input into a
6    computer?
7    **A.**    Yes.
8    **Q.**    And so when you click you can either choose yes or
9    no, and sometimes there's an other option?
10    **A.**    Correct.
11    **Q.**    And so here the yes option would have been selected
12    based on what he's telling you?
13    **A.**    Yes.
14    **Q.**    And had he told you something, some extra detail
15    that couldn't just be done by yes or no, where would you have
16    put that information?
17    **A.**    There's a comments section at the end.
18    **Q.**    And you put it in the comments section because you
19    don't actually get to make a determination so you want the
20    people making the determination later to know those extra
21    details he's telling you?
22    **A.**    Yes.
23    **Q.**    Now, the next question, what is that question?
24    What does that have to do with?
25    **A.**    That's asking if the applicant registered with FEMA

1    for assistance, and he said yes.

2        Q.    And that was another requirement for the

3    applicants?

4        A.    They didn't have to, but a lot of them did register

5    with FEMA.

6        Q.    Now, this portion below that, you can highlight the

7    damaged residence.  Here, where it's saying damaged

8    residence, it's supposed to be referring to a residence

9    damaged by the hurricane?

10       A.    Correct.

11       Q.    And then if we can go to the next set of questions,

12   they're all questions about the residence that's supposedly

13   been damaged in the hurricane?

14       A.    Yes.

15       Q.    And what are those?  I guess one through nine.

16   What's the first one?

17       A.    The first one is asking the type of structure.  And

18   it's saying it's a single home, not a mobile home.

19       Q.    And so would that still have been something --

20       A.    I mean --

21       Q.    -- that is an answer that comes through a drop-down

22   box selection?

23       A.    Yes.

24       Q.    So did you type in including mobile home?

25       A.    No.  That's how it comes down.

1      Q.    That comes in the drop-down box.  So the next
2  question?
3      A.    If you are a mobile home owner, you are eligible
4  whether you -- whether or not you own the land.  If you are a
5  mobile home owner, did you own the land?  And it's left blank
6  because it wasn't a mobile home.
7      Q.    The third question?
8      A.    Is or was damaged residence located in the flood
9  plane, and he said yes.
10     Q.    And the one after that?
11     A.    The tax parcel I.D. of the damaged residence is
12  empty.  We didn't have that information.
13     Q.    And the next question?
14     A.    How do you anticipate using the Road Home
15  compensation, and he noted to keep your home.
16     Q.    And that would be --
17          THE COURT:  To keep what?
18          THE WITNESS:  To keep his home.
19  BY MR. MOORE:
20     Q.    That would, again, been out of the drop-down box?
21     A.    Yes.
22     Q.    And the question after that?
23     A.    Did you have an electric utility in your name on
24  September 24, if affected by Hurricane Rita?  The drop-down
25  box says other.  I typed in Jeff Davis Electric Company.

1    **Q.**   I guess we skipped six, but did we skip six because

2    he was there for a Rita claim?

3    **A.**   Correct.  Question No. 6 is in reference to

4    Hurricane Katrina so we left that blank and went to number

5    seven because his home was affected by Hurricane Rita, not

6    Katrina.

7    **Q.**   Now, seven, what were your options in terms of a

8    response to No. 7?

9    **A.**   There were different electric companies, and Jeff

10   Davis wasn't listed so I chose other.

11   **Q.**   And then after you chose other it gave you the

12   opportunity to type Jefferson Davis Electric in?

13   **A.**   Yes.

14   **Q.**   And so the other was an actual -- that's a

15   drop-down menu selection?

16   **A.**   Yes, it is.

17   **Q.**   And it was necessary in this case in order for you

18   to tell them what the --

19            THE COURT:  I have no idea what that means.  If I

20       don't understand it --

21            THE WITNESS:  A drop down --

22            THE COURT:  No offense; but if I don't understand

23       it, I don't think anybody else is going to understand

24       it.  I've been to law school.  I've been doing this for

25       30 years.  I have no idea what y'all are talking about.

1    BY MR. MOORE:

2        Q.   Let's try to make this a little bit clearer for the

3    jury.  For No. 7, how could No. 7 be answered through the

4    computer?

5        A.   On the computer there's a box that you click and

6    it's going to drop down some options for you to select.  When

7    you say drop down, it's going to list different options.  You

8    can choose option one, which might have been Entergy, option

9    two, which would have been Beauregard Electric, and they list

10   all these different electric companies.  I chose other

11   because his electric company, which was Jeff Davis Electric

12   Company, wasn't one of the options that I could have picked.

13   So I picked other and on the side I typed in Jeff Davis

14   Electric Company so that whoever read the application would

15   know what electric company he was using at the time of the

16   storm.

17       Q.   And part of the reason is because he was supposed

18   to submit documentation of that later, right?

19       A.   Correct.

20       Q.   So they were going to receive some paperwork from

21   Jefferson Davis Electric so you wanted them to know that that

22   was the right company?

23       A.   Correct.

24       Q.   What about No. 8?

25       A.   No. 8 asked if you have an appraiser for your

**Deidre D. Juranka, RPR**
**United States Court Reporter**
**Western District of Louisiana**

1    property --
2            THE COURT:  Can we highlight, please, because it's
3        all getting jumbled together.
4        A.    No. 8 is asking do you have an appraisal on your
5    property that was completed between January 1st, 2000 and the
6    day before the date of the storm, and he said no.
7        Q.    And then No. 9?
8        A.    "Have you obtained a building permit?"  He said no.
9        Q.    Now, right under No. 9 there's something that's
10   handwritten.  What is that again?
11       A.    That's the applicant's initials.
12       Q.    Again, that's reflecting that you guys went over
13   all these answers and he was good with his responses and he
14   was certifying that by initialling it?
15       A.    Yes.
16       Q.    Now, page four of the document.  Just do the top
17   half of page four.  The top half of page four, just to move
18   it a little bit quicker, we just have the year the home -- an
19   estimate of the year the home was made and then just the
20   estimate of the structural damage and insurance information.
21   And it says no there.  Why does it say no?
22       A.    Because he didn't incur any legal costs to settle
23   his insurance claim.
24       Q.    And then the bottom portion?
25       A.    It's asking if there are any state or tax liens on

1    the property.  He said no.

2         The SBA is in reference to the Small Business

3    Administration.  It's asking if he had applied for any

4    assistance from SBA, and he said yes.

5         Then it asked did you receive any storm related

6    assistance, and he said no.

7         Q.    And then he just gives you his application number

8    and says he hadn't applied for anything else --

9         A.    Correct.

10        Q.    -- from SBA?  And then at the bottom, does he

11   initial that page there?

12        A.    Yes, he did.

13        Q.    Now, the beginning of the next page, we'll just do

14   the FEMA portion up at the top.  And what is -- what are

15   these questions about?

16        A.    It asked if he applied for any FEMA assistance.  He

17   said yes.  Did you receive any assistance from FEMA?  And he

18   said yes.  And then it tells his FEMA number, the amount he

19   was approved for, which was 10,500, and the amount he

20   received, which is 10,500.  And then it asked if he applied

21   for any other FEMA assistance, and he said no.

22        Q.    And then the bottom -- the middle portion?

23        A.    This is the --

24             THE COURT:  What does that mean?  What is that

25   question?

1           THE WITNESS:  The FEMA?

2           THE COURT:  The middle portion.  What is the

3      question?

4           MR. MOORE:  I'm sorry.  That is directed to

5      Mr. Walker so that he can know which page to highlight.

6           THE COURT:  In chambers.

7                     (Recess is taken.)

8           THE COURT:  You can remain seated.  All right.

9      Let's go.

10  BY MR. MOORE:

11      Q.   What are -- on Page 5 of Government's Exhibit 2,

12  what are we looking at on the screen right now?

13      A.   This is the occupant information which states who

14  was living in the home at the time of the storm.

15      Q.   And so he's saying here that he was living at that

16  address at the time of the storm?

17      A.   Yes.

18      Q.   Now, just -- and, Ms. Hawkins, what is it you're

19  looking at on the bottom half of Government's Exhibit 2,

20  Page 5?

21      A.   It lists the homeowner information which is

22  Mr. Adley's name, his income information, and whether or not

23  he's eligible to get a loan.  It says yes.

24      Q.   And again, what's handwritten at the bottom of the

25  page?

1        A.   It's his initials.

2        Q.   What does that reflect for you?

3        A.   That he understood and agreed with what was

4    printed.

5        Q.   If we can go to Page 6 of this document, the top

6    half of the page.  Now, at the top portion is a number of

7    just Y's and yeses without the questions so we're just --

8             THE COURT:  Wait.  Y's and yeses?

9             MR. MOORE:  I'm sorry.

10            THE COURT:  What?

11   BY MR. MOORE:

12       Q.   Questions 1 through 11, what's reflected on the

13   screen for 1 through 11?

14       A.   It's just a list of questions, yes or no.

15       Q.   And do you recall what those questions were?

16       A.   No.

17       Q.   We'll move to the comments portion.

18            THE COURT:  Okay.  We're going to break for lunch

19            right now.  Get your act together.  Okay.  I have no

20            idea what's going on here.  Get your act together.

21            Okay.  We'll come back at 12:00.

22            (Recess is taken.  Court was not resumed.)

23

24

25                    *  *  *  *  *  *  *

1
2
3                          **CERTIFICATE**
4
5        I hereby certify this 10th day of February, 2016, that
6   the foregoing is, to the best of my ability and
7   understanding, a true and correct transcript of the
8   proceedings in the above-entitled matter.
9
10                              S/Deidre D. Juranka, RPR
                                Official Court Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Deidre D. Juranka, RPR**
**United States Court Reporter**
**Western District of Louisiana**